# GULF OIL CORP. ET AL. *v.* COPP PAVING CO., INC., ET AL.

No. 73–1012. Argued October 21–22, 1974—
Decided December 17, 1974

Powell, J., delivered the opinion of the Court, in which Burger, C. J., and Stewart, White, Marshall, Blackmun, and Rehnquist, JJ., joined. Marshall, J., filed a concurring opinion, *post*, p. 203. Douglas, J., filed a dissenting opinion, in which Brennan, J., joined, *post*, p. 204.

*Moses Lasky* argued the cause for petitioners. With him on the briefs were *Richard Haas* and *George A. Cumming, Jr.*

*Martin M. Shapero* argued the cause for respondents. With him on the brief was *Jack Corinblit.**

---

*Solicitor General Bork, Assistant Attorney General Kauper, William L. Patton,* and *Carl D. Lawson* filed a brief for the United States as *amicus curiae.*

MR. JUSTICE POWELL delivered the opinion of the Court.

This case concerns the jurisdictional requirements of § 2 (a) of the Clayton Act, as amended by the Robinson-Patman Act, 49 Stat. 1526,[1] 15 U. S. C. § 13 (a), and of §§ 3 and 7 of the Clayton Act, 38 Stat. 731, as amended, 15 U. S. C. §§ 14 and 18. It presents the questions whether a firm engaged in entirely intrastate sales of asphaltic concrete, a product that can be marketed only locally, is a corporation "in commerce" within the meaning of each of these sections, and whether such sales are "in commerce" and "in the course of such commerce" within the meaning of §§ 2 (a) and 3 respectively. The Court of Appeals for the Ninth Circuit held these jurisdictional requirements satisfied, without more, by the fact that sales of asphaltic concrete are made for use in construction of interstate highways. 487 F. 2d 202 (1973). We reverse.

I

Asphaltic concrete is a product used to surface roads and highways. It is manufactured at "hot plants" by combining, at temperatures of approximately 375° F, about 5% liquid petroleum asphalt with about 95% aggregates and fillers. The substance is delivered by truck to construction sites, where it is placed at temperatures of about 275° F. Because it must be hot when placed and because of its great weight and relatively low value, asphaltic concrete can be sold and delivered profitably only within a radius of 35 miles or so from the hot plant.

Petitioners Union Oil Co., Gulf Oil Corp., and Edgington Oil Co., defendants below, produce liquid petroleum

---

[1] Hereafter, for simplicity, cited as § 2 (a) of the Robinson-Patman Act.

asphalt from crude oil at their California refineries. The companies sell liquid asphalt to their subsidiaries and other firms throughout the Western States. The market in liquid asphalt is interstate, and each oil company concedes that it engages in interstate commerce.

Petitioner Union Oil sells some of its liquid asphalt to its wholly owned subsidiary, Sully-Miller Contracting Co., which uses it to manufacture asphaltic concrete at 11 hot plants in Los Angeles and Orange Counties, Cal. Gulf Oil sells all of its liquid asphalt to its wholly owned subsidiary, petitioner Industrial Asphalt, Inc. Industrial distributes the liquid asphalt to third parties and also uses it to produce asphaltic concrete at 55 hot plants in California, Arizona, and Nevada. Edgington Oil sells its liquid asphalt to, *inter alia,* Sully-Miller, Industrial, and respondents.

Respondents, Copp Paving Co., Inc., Copp Equipment Co., Inc., and Ernest A. Copp,[1a] operate a hot plant in Artesia, Cal., where they produce asphaltic concrete both for Copp's own use as a paving contractor and for sale to other contractors. Copp's operations and asphaltic concrete sales are limited to the southern half of Los Angeles County, where it competes with Sully-Miller and Industrial in the asphaltic concrete market. All three firms sell a more than *de minimis* share of their asphaltic concrete for use in the construction of local segments of the interstate highway system. Neither Copp, Industrial, nor Sully-Miller makes any interstate sales of the product.[2]

---

[1a] Respondents are collectively referred to hereinafter as Copp.

[2] Although Industrial's Nevada hot plant is sufficiently close to the California and Arizona borders to allow sales and deliveries to those States, Industrial has disavowed such sales, without contradiction. App. 117.

Copp filed this complaint in the District Court for the Central District of California against the oil companies, Sully-Miller, and Industrial, seeking injunctive relief and treble damages.[3] The complaint, as amended, alleged that the various defendants had committed a catalog of antitrust violations with respect to both the asphalt oil and asphaltic concrete markets. Claiming harm to itself as a consumer of liquid asphalt, Copp alleged: that the defendants had fixed prices and allocated the asphalt oil market geographically, in violation of § 1 of the Sherman Act, 26 Stat. 209, as amended, 15 U. S. C. § 1; that they had sold liquid asphalt at discriminatory prices to Copp and other purchasers, in violation of § 2 (a) of the Robinson-Patman Act; and that Gulf Oil had violated § 7 of the Clayton Act by acquiring Industrial. Also claiming harm to itself as a competitor in the asphaltic concrete market, Copp further alleged: that the defendants had fixed prices, divided the market geographically, and employed various methods of monopolizing and attempting to gain a monopoly in the Los Angeles area market, in violation of §§ 1 and 2 of the Sherman Act; that, in violation of § 3 of the Clayton Act, Industrial and Sully-Miller had conditioned sales of asphaltic concrete in areas where Copp did not compete on customers' agreeing to buy only from the defendants in areas where Copp did compete, and had "tied" sales of asphaltic concrete to sales of other commodities and to favorable extensions of credit; that, in violation of § 7 of the Clayton Act, Gulf Oil had acquired Industrial and Union Oil had acquired Sully-Miller, these acquisitions apparently having the effect of lessening competition in the Los Angeles asphaltic concrete market; and, finally, that Industrial and Sully-Miller had discriminated in the prices at which they sold asphaltic concrete, charging

---

[3] 15 U. S. C. § 15.

higher prices in areas where Copp did not compete, this in violation of § 2 (a).

Because of the liquid asphalt claims, the case was one of the *Western Liquid Asphalt* cases transferred, pursuant to 28 U. S. C. § 1407, to the District Court for the Northern District of California for coordinated pretrial proceedings.[4]  The defendants thereafter moved for summary judgment in favor of Sully-Miller, against which Copp had alleged only violations arising from conduct in the asphaltic concrete market.  The motion also sought to limit the issues as to the other defendants to those involving liquid asphalt.

The District Court ordered full discovery as to jurisdiction over Copp's asphaltic concrete claims.  At the conclusion of discovery, Copp's jurisdictional showing rested solely on the fact that some of the streets and roads in the Los Angeles area are segments of the federal interstate highway system, and on a stipulation that a greater than *de minimis* amount of asphaltic concrete is used in their construction and repair.  The District Court thereupon entered an order dismissing all claims against Sully-Miller and those claims against the other defendants involving the marketing of asphaltic concrete.

In its opinion accompanying this order the court explicitly discussed only the jurisdictional requirements of the Sherman Act.[5]  On the facts presented to it, the court found that asphaltic concrete is made wholly from components produced and purchased intrastate and that

---

[4] *In re Western Liquid Asphalt,* 303 F. Supp. 1053 (JPML 1969); *In re Western Liquid Asphalt,* 309 F. Supp. 157 (JPML 1970).  As explained *infra,* the case here concerns only asphaltic concrete, not liquid asphalt.

[5] 1972 CCH Trade Cases ¶ 74,013.

The court held the asphalt oil claims against the oil companies and Industrial within its jurisdiction because of the interstate character of that market.  That ruling is not before us.

the product's market is exclusively and necessarily local. Because of these factors, the court concluded that the alleged restraints of trade in asphaltic concrete could not be deemed within the flow of interstate commerce, despite use of the product in interstate highways. Moreover, Copp had failed to show, either by deduction from the evidence or by the evidence itself, that the alleged restraints as to asphaltic concrete would affect any interstate market. It had neither shown a necessary or probable adverse consequence to the construction of interstate highways and hence to the flow of commerce, nor had it suggested or supported a theory by which restraints on local trade in asphaltic concrete affect the interstate liquid asphalt market. The court held that it lacked jurisdiction of Copp's asphaltic concrete claims under the Sherman Act and therefore that Copp also had failed to support jurisdiction under the Robinson-Patman and Clayton Acts.

On Copp's interlocutory appeal, 28 U. S. C. § 1292 (b), the Ninth Circuit reversed, holding as to the Sherman Act claims "that the production of asphalt for use in interstate highways rendered the producers 'instrumentalities' of interstate commerce and placed them 'in' that commerce as a matter of law." 487 F. 2d, at 204. Having so concluded, the court held that jurisdiction properly attached to Copp's Clayton and Robinson-Patman Act claims as well, since those Acts were intended to supplement the purpose and effect of the Sherman Act. *Id.,* at 205–206.[6]

We granted certiorari, despite the interlocutory character of the Ninth Circuit's judgment, because of the importance of the issues both to this litigation and to

---

[6] The court reserved the question of summary judgment in favor of defendant Sully-Miller, holding that question not properly before it under Fed. Rule Civ. Proc. 54 (b).

proper interpretation of the jurisdictional reach of the antitrust laws, and because of ostensible conflicts with decisions of other circuits.[7]  We limited the grant, however, to the questions arising under the Clayton and Robinson-Patman Acts.[8]  415 U. S. 988 (1974).

## II

The text of each of the statutory provisions involved here is set forth in the margin.[9]  In brief, § 2 (a) of the

[7] 28 U. S. C. § 1254 (1).  See *Hawaii* v. *Standard Oil Co. of California,* 405 U. S. 251 (1972).

[8] Because of our limited grant and because of the Ninth Circuit's reservation of judgment as to Sully-Miller, see n. 6, *supra,* Union Oil and Industrial are the only defendants who have participated in argument here.

[9] Robinson-Patman Act, § 2 (a), Act of June 19, 1936, c. 592, 49 Stat. 1526, 15 U. S. C. § 13 (a):

"It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce . . . where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce . . . ."

Clayton Act, Act of Oct. 15, 1914, c. 323, 38 Stat. 730, as amended:

Section 3 (15 U. S. C. § 14):

"It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities . . . on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce."

Section 7 (15 U. S. C. § 18):

"No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capi-

Robinson-Patman Act forbids "any person engaged in commerce, in the course of such commerce" to discriminate in price "where either or any of the purchases involved in such discrimination are in commerce" and where the discrimination has substantial anticompetitive effects "in any line of commerce." Section 3 of the Clayton Act makes it unlawful "for any person engaged in commerce, in the course of such commerce" to make tie-in sales or enter exclusive-dealing arrangements, where the effect "may be to substantially lessen competition or tend to create a monopoly in any line of commerce." Section 7 of the Clayton Act forbids certain acquisitions by a corporation "engaged in commerce" of the assets or stock "of another corporation engaged also in commerce," where the effect may be substantially to lessen competition "in any line of commerce in any section of the country."

The explicit reach of these provisions extends only to persons and activities that are themselves "in commerce," the term "commerce" being defined in § 1 of the Clayton Act, insofar as relevant here, as "trade or commerce among the several States and with foreign nations . . . ." 15 U. S. C. § 12. This "in commerce" language differs distinctly from that of § 1 of the Sherman Act, which includes within its scope all prohibited conduct "in restraint of trade or commerce among the several States, or with foreign nations . . . ." The jurisdictional reach of § 1 thus is keyed directly to effects on interstate markets and the interstate flow of goods. Moreover, our cases have recognized that in enacting § 1 Congress "wanted to go to the utmost extent of its Constitutional power in restraining trust and monopoly agreements . . . ."

tal . . . of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly. . . ."

*United States* v. *South-Eastern Underwriters Assn.*, 322 U. S. 533, 558 (1944). Consistently with this purpose and with the plain thrust of the statutory language, the Court has held that, however local its immediate object, a "contract, combination . . . or conspiracy" nonetheless may constitute a restraint within the meaning of § 1 if it substantially and adversely affects interstate commerce. *E. g., Mandeville Island Farms* v. *American Crystal Sugar Co.*, 334 U. S. 219, 234 (1948). "If it is interstate commerce that feels the pinch, it does not matter how local the operation which applies the squeeze." *United States* v. *Women's Sportswear Mfrs. Assn.*, 336 U. S. 460, 464 (1949).

In contrast to § 1, the distinct "in commerce" language of the Clayton and Robinson-Patman Act provisions with which we are concerned here appears to denote only persons or activities within the flow of interstate commerce—the practical, economic continuity in the generation of goods and services for interstate markets and their transport and distribution to the consumer. If this is so, the jurisdictional requirements of these provisions cannot be satisfied merely by showing that allegedly anticompetitive acquisitions and activities *affect* commerce. Unless it appears (i) that Sully-Miller engages in interstate commercial activities (§ 7), (ii) that Industrial's alleged exclusive-dealing arrangements and discriminatory sales occur in the course of its interstate activities (§§ 2 (a) and 3), and (iii) that at least one of Industrial's allegedly discriminatory sales was made in interstate commerce (§ 2 (a)), Copp's claims must fail.

Copp argues, and the Court of Appeals for the Ninth Circuit agreed, that it had made exactly this sort of "in commerce" showing. Copp does not contend that Industrial and Sully-Miller in fact make interstate asphaltic concrete sales or are otherwise directly involved in na-

tional markets. Cf. *United States* v. *Philadelphia National Bank,* 374 U. S. 321, 336 n. 12 (1963). Nor does it contend that the local market in asphaltic concrete is an integral part of the interstate market in other component commodities or products. Instead, Copp's "in commerce" argument turns entirely on the use of asphaltic concrete in the construction of interstate highways.

In support of this argument, Copp relies primarily on cases decided under the Fair Labor Standards Act.[10]   In the first of these, *Overstreet* v. *North Shore Corp.,* 318 U. S. 125 (1943), the Court held that because interstate roads and railroads are indispensable instrumentalities of interstate commerce, employees engaged in the construction or repair of such roads are employees "in commerce" to whom, by its terms, the Fair Labor Standards Act extends. Subsequently in *Alstate Construction Co.* v. *Durkin,* 345 U. S. 13 (1953), the Court held that since interstate highways are instrumentalities of commerce, employees engaged in the manufacture of materials used in their construction are properly deemed to be engaged "in the production of goods for commerce," within the meaning of that phrase in the Fair Labor Standards Act. Copp reasons that since the connection between manufacture of road materials and interstate commerce was enough for application of the Fair Labor Standards Act, it also should be sufficient to warrant invocation of the Clayton and Robinson-Patman Act provisions against sellers and sales of such materials.

But we are concerned in this case with significantly different statutes. As in *Overstreet* and *Alstate,* there is no question of Congress' power under the Commerce Clause to include otherwise ostensibly local activities within the reach of federal economic regulation, when

---

[10] 52 Stat. 1060, as amended, 29 U. S. C. § 201 *et seq.*

such activities sufficiently implicate interstate commerce.[11] The question, rather, is how far Congress intended to extend its mandate under the Clayton and Robinson-Patman Acts.[12] The answer depends on the statutory language, read in light of its purposes and legislative history. See *FTC* v. *Bunte Bros.*, 312 U. S. 349 (1941).

Congress has deemed interstate highways critical to the national economy and has authorized extensive federal participation in their financing and regulation. Nothing, however, in the Federal-Aid Highway Act[13] or other legislation evinces an intention to apply the full range of antitrust laws to persons who, as part of their local business, supply materials used in construction of local segments of interstate roads. Nor does the fact that interstate highways are instrumentalities of commerce somehow render the suppliers of materials instrumentalities of commerce as well, in the sense used in *Overstreet*. No different conclusion can be drawn from *Alstate*. The statute involved there explicitly reached persons employed "in the production of goods for commerce." Congress could and, according to the Court in *Alstate*, did find that the federal concerns embodied in the Fair Labor Standards Act required its application to employees pro-

---

[11] *E. g., Heart of Atlanta Motel* v. *United States*, 379 U. S. 241, 249–258 (1964).

[12] The jurisdictional inquiry under general prohibitions like these Acts and § 1 of the Sherman Act, turning as it does on the circumstances presented in each case and requiring a particularized judicial determination, differs significantly from that required when Congress itself has defined the specific persons and activities that affect commerce and therefore require federal regulation. Compare *United States* v. *Yellow Cab Co.*, 332 U. S. 218, 232–233 (1947), with, *e. g., Perez* v. *United States*, 402 U. S. 146 (1971); *Maryland* v. *Wirtz*, 392 U. S. 183 (1968); and *Katzenbach* v. *McClung*, 379 U. S. 294 (1964).

[13] 23 U. S. C. § 101 *et seq.*

ducing materials for use in interstate highways. But neither this nor the Court's holding in *Alstate* places such employees, or the sellers and sales of such materials, "in commerce" as a matter of law for purposes of the Clayton and Robinson-Patman Acts.

Copp's "in commerce" argument rests essentially on a purely formal "nexus" to commerce: the highways are instrumentalities of interstate commerce; therefore any conduct of petitioners with respect to an ingredient of a highway is *per se* "in commerce." Copp thus would have us expand the concept of the flow of commerce by incorporating categories of activities that are perceptibly connected to its instrumentalities. But whatever merit this categorical inclusion-and-exclusion approach may have when dealing with the language and purposes of other regulatory enactments, it does not carry over to the context of the Robinson-Patman and Clayton Acts. The chain of connection has no logical endpoint. The universe of arguably included activities would be broad and its limits nebulous in the extreme. See *Alstate Construction Co.* v. *Durkin, supra,* at 17–18 (DOUGLAS, J., dissenting). More importantly, to the extent that those limits could be defined at all, the definition would in no way be anchored in the economic realities of interstate markets, the intensely practical concerns that underlie the purposes of the antitrust laws. See *United States* v. *Yellow Cab Co.,* 332 U. S. 218, 231 (1947).

In short, assuming, *arguendo,* that the facially narrow language of the Clayton and Robinson-Patman Acts was intended to denote something more than the relatively restrictive flow-of-commerce concept, we think the nexus approach would be an irrational way to proceed. The justification for an expansive interpretation of the "in commerce" language, if such an interpretation is viable at all, must rest on a congressional intent that the Acts

reach all practices, even those of local character, harmful to the national marketplace. This justification, however, would require courts to look to practical consequences, not to apparent and perhaps nominal connections between commerce and activities that may have no significant economic effect on interstate markets. We hold, therefore, that Sully-Miller's and Industrial's sales to interstate highway contractors are not sales "in commerce" as a matter of law within the jurisdictional ambit of Robinson-Patman Act § 2 (a) and Clayton Act §§ 3 and 7.

### III

Our rejection of the "nexus to commerce" theory requires that the Ninth Circuit's judgment be reversed. Copp also advances, somewhat obliquely, a second theory to support that judgment. It contends that, despite the facially narrow "in commerce" language of the Robinson-Patman and Clayton Act provisions, Congress intended those provisions to manifest the full degree of its commerce power. Therefore, it is argued, the language should not be limited to the flow-of-commerce concept defined by this Court and other courts, but rather should be held to extend, as does § 1 of the Sherman Act, to all persons and activities that have a substantial effect on interstate commerce. We find this theory equally unavailing on the record here.

### A

As to § 2 (a) of the Robinson-Patman Act at least, the extraordinarily complex legislative history fails to support Copp's argument. When the Patman bill was passed by the House, it contained, in addition to the present narrow language of § 2 (a), the following provision:

"[I]t shall also be unlawful for any person, *whether in commerce or not,* either directly or indirectly, to

discriminate in price between different purchasers . . . where . . . such discrimination may substantially lessen competition . . . ." [14]

The Conference Committee, however, deleted this "effects on commerce" provision, leaving only the "in commerce" language of § 2 (a).[15] Whether Congress took this action because it wanted to reach only price discrimination in interstate markets or because of its then understanding of the reach of the commerce power,[16] its action strongly militates against a judgment that Congress intended a result that it expressly declined to enact. Moreover, even if the legislative history were ambiguous, the courts in nearly four decades of litigation have interpreted the statute in a manner directly contrary to an "effects on commerce" approach. With almost perfect consistency, the Courts of Appeals have read the language requiring that "either or any of the purchases involved in such discrimination [be] in commerce" to mean that § 2 (a) applies only where " 'at least one of the two transactions which, when compared, generate a discrimination . . . cross[es] a state line.' " [17] In the face of this long-

---

[14] H. R. 8442, 74th Cong., 2d Sess. (1936) (emphasis added).

[15] H. R. Conf. Rep. No. 2951, 74th Cong., 2d Sess. (1936).

[16] Compare F. Rowe, Price Discrimination under the Robinson-Patman Act 77–83 (1962) with Note, Restraint of Trade—Robinson-Patman Act, 86 Harv. L. Rev. 765, 770–772 (1973).

[17] *Hiram Walker, Inc.* v. *A & S Tropical, Inc.*, 407 F. 2d 4, 9 (CA5), cert. denied, 396 U. S. 901 (1969); *Belliston* v. *Texaco, Inc.*, 455 F. 2d 175, 178 (CA10), cert. denied, 408 U. S. 928 (1972). No decision of this Court implies any contrary approach. In *Moore* v. *Mead's Fine Bread Co.*, 348 U. S. 115 (1954), the plaintiff sold bread locally, in competition with Mead's, a firm with bakeries in several States. Moore alleged that Mead's sold bread in his town at a price lower than that which it charged for bread delivered from its in-state plant to customers in an adjoining State. The Tenth Circuit held that Mead's activities were essentially local, and that if

standing interpretation and the continued congressional silence, the legislative history does not warrant our extending § 2 (a) beyond its clear language to reach a multitude of local activities that hitherto have been left to state and local regulation. See *FTC* v. *Bunte Bros.*, 312 U. S. 349 (1941).

## B

With respect to §§ 3 and 7 of the Clayton Act, the situation is not so clear. Both provisions were intended to complement the Sherman Act and to facilitate achievement of its purposes by reaching, in their incipiency, acts and practices that promise, in their full growth, to impair competition in interstate commerce. *E. g., United States* v. *E. I. du Pont de Nemours & Co.*, 353 U. S. 586, 589 (1957); *Standard Fashion Co.* v. *Magrane-Houston Co.*, 258 U. S. 346 (1922). The United States argues in its *amicus* brief that, given this purpose, the "in commerce" language of §§ 3 and 7 should be seen as no more than a historical anomaly. When these sections were originally enacted, it was thought that Congress' Commerce Clause power reached only those subjects within the flow of commerce, then defined rather narrowly by the Court. Thus, it is argued, the "in commerce" language was thought to be coextensive with the reach of the Commerce Clause and to bring within the ambit of the Act all activities over which Congress could exercise its constitutional authority. Since passage of the Act, this Court's decisions

§ 2 (a) applied to them it would exceed Congress' commerce power. The Court (Douglas, J.) unanimously reversed, stating that Congress clearly has power to reach the local activities of a firm that finances its predatory practices through multistate operations. This language, however, spoke to the commerce power rather than to jurisdiction under § 2 (a). In fact, Mead's did have interstate sales and its price discrimination thus fell within the literal language of the statute.

have read Congress' power under the Commerce Clause more expansively, extending it beyond the flow of commerce to all activities having a substantial effect on interstate commerce. See *Mandeville Island Farms* v. *American Crystal Sugar Co.*, 334 U. S., at 229–233. The United States concludes that the scope of the Clayton Act, like that of the Sherman Act, should be held to have expanded correspondingly, both because of Congress' clear intention to reach as far as it could and because Congress' purpose to foster competition in interstate commerce could not otherwise wholly be achieved.

This argument from the history and practical purposes of the Clayton Act is neither without force nor without at least a measure of support.[18] But whether it would justify radical expansion of the Clayton Act's scope beyond that which the statutory language defines—expansion, moreover, by judicial decision rather than amendatory legislation—is doubtful. In any event, this case does not present an occasion to decide the question. Even if the Clayton Act were held to extend to acquisitions and sales having substantial effects on commerce, a court cannot presume that such effects exist. The plaintiff must allege and prove that apparently local acts in fact have adverse consequences on interstate markets and the interstate flow of goods in order to invoke federal antitrust prohibitions. See *United States* v. *Yellow Cab Co.*, 332 U. S., at 230–234.

Copp was allowed full discovery as to all interstate commerce issues. It relied primarily on the nexus theory rejected above, and presented no evidence of effect on interstate commerce. Instead it argued merely that such effects could be presumed from the use of asphaltic concrete in interstate highways. The District Court con-

---

[18] See *Standard Oil Co.* v. *United States,* 337 U. S. 293, 314–315 (1949).

cluded, on the basis of the record before it, that petitioners' alleged antitrust violations had no "substantial impact on interstate commerce."[19]  There may be circumstances in which activities, like those of Sully-Miller and Industrial, would have such effects on commerce. On the record in this case, however, the conclusion of the District Court that no such circumstances existed here cannot be considered erroneous. . This being so, the "effects on commerce" theory, even if legally correct, must fail for want of proof.

The judgment of the Court of Appeals is

*Reversed.*

MR. JUSTICE MARSHALL, concurring.

I join in the judgment and opinion of the Court, with one qualification.  Part III–B of the opinion correctly notes that we have no occasion today to pass upon the

---

[19] 1972 CCH Trade Cases ¶ 74–013, p. 92,208.  Copp makes no specific objection here to the District Court's use of summary judgment procedure, see Brief for Respondents 11–12, nor to the form of the judgment.  Moreover, there is no indication that Copp was foreclosed from presenting all available evidence concerning the interstate commerce issues, at least as to §§ 3 and 7.  Cf. *McBeath* v. *Inter-American Citizens for Decency Comm.*, 374 F. 2d 359, 363 (CA5 1967).  In any event, assuming that the interstate commerce requirements of §§ 3 and 7 are properly deemed issues of subject-matter jurisdiction, rather than simply necessary elements of the federal claims, cf., *e. g.*, *United States* v. *Employing Plasterers Assn.*, 347 U. S. 186 (1954); *Mandeville Island Farms* v. *American Crystal Sugar Co.*, 334 U. S. 219 (1948); 5 J. Moore, Federal Practice ¶ 38.36 [2.–2], p. 299 (2d ed. 1974), there is, as the dissenting opinion by MR. JUSTICE DOUGLAS notes, an identity between the "jurisdictional" issues and certain issues on the merits, and hence, under *Land* v. *Dollar*, 330 U. S. 731 (1947), no objection to reserving the jurisdictional issues until a hearing on the merits.  By the same token, however, there is no objection to use, in appropriate cases, of summary judgment procedure to determine whether there is a genuine issue of material fact as to the interstate commerce elements.

applicability of the Clayton Act to activities having a substantial effect on commerce although not "in commerce," since no such effects are present in this case. For the same reason, we ought not to characterize the construction offered by the United States as a "radical expansion of the Clayton Act's scope." As the Court itself says, "the situation is not so clear." Until the issue is properly presented by a case requiring its resolution, I would express no opinion on it.

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BRENNAN joins, dissenting.

I suppose it would be conceded that if one person or company acquired all the asphaltic concrete plants in the United States, there might well be a violation of § 2 of the Sherman Act, which makes unlawful a monopoly of "any part of the trade or commerce among the several States." 26 Stat. 209, as amended, 15 U. S. C. § 2. Moreover, even though their sales were all intrastate, they would come within the ban of § 1 of the Sherman Act, if they substantially affected interstate commerce. For in the Sherman Act, we held, "Congress wanted to go to the utmost extent of its Constitutional power in restraining trust and monopoly argreements ...." *United States v. South-Eastern Underwriters Assn.,* 322 U. S. 533, 558 (1944).

While the Clayton Act modified the Sherman Act by restricting possible application of the antitrust laws to labor unions,[1] and by expanding the scope of those laws to cover the aggregation of economic power through stock acquisitions,[2] there is not a word to suggest that

---

[1] 38 Stat. 731, 15 U. S. C. § 17. See H. R. Rep. No. 627, 63d Cong., 2d Sess., 14–16 (1914); *United States v. Hutcheson,* 312 U. S. 219 (1941).

[2] 15 U. S. C. § 18; H. R. Rep. No. 627, *supra,* at 17. See also *United States v. Penn-Olin Chemical Co.,* 378 U. S. 158, 170–171

when Congress defined the term "commerce" it desired to contract the scope of that term.[3]   The legislative history does not furnish even a bare suggestion or inference that "commerce" under the Clayton Act meant something less than it meant under the Sherman Act. The Clayton Act became the law in 1914; and prior to that time the Court had held over and over again that acts or conduct wholly intrastate might be "in restraint of trade or commerce" as that phrase was used in the Sherman Act. *Swift & Co.* v. *United States,* 196 U. S. 375, 397 (1905); *United States* v. *Patten,* 226 U. S. 525, 541–543 (1913).   These holdings were reflected in the "affecting commerce" standard of the *Shreveport Rate Cases, Houston & Texas R. Co.* v. *United States,* 234 U. S. 342, 353–355 (1914).   The primary definition of commerce, for Clayton Act purposes, is "trade or commerce among the several States." [4]   In the years just preceding passage of

---

(1964); *United States* v. *E. I. du Pont de Nemours & Co.,* 353 U. S. 586, 597 (1957).

[3] The definition of "antitrust laws" as used in the Clayton Act includes the Sherman Act. 15 U. S. C. · § 12. The definition of "commerce" was actually "broadened so as to include trade and commerce between any insular possessions or other places under the jurisdiction of the United States, which at present do not come within the scope of the Sherman antitrust law or other laws relating to trusts." H. R. Rep. No. 627, *supra,* at 7.

The Sherman Act declares illegal every contract, combination, or conspiracy "in restraint of trade or commerce among the several States . . . ." 15 U. S. C. § 1. It also makes a misdemeanor a monopoly of "any part of the trade or commerce among the several States . . . ." 15 U. S. C. § 2.

[4] "Commerce" as used in the Clayton Act is defined in § 1 as follows:

" 'Commerce,' as used herein, means trade or commerce among the several States and with foreign nations, or between the District of Columbia or any Territory of the United States and any State, Territory, or foreign nation, or between any insular possessions or other places under the jurisdiction of the United States, or between

that Act, this Court had held on several occasions that the phrase "among the several States" embraces all commerce save that "which is confined to a single State *and does not affect* other States." *Second Employers' Liability Cases,* 223 U. S. 1, 46–47 (1912) (emphasis added); *The Minnesota Rate Cases,* 230 U. S. 352, 398–399 (1913). In applying the Clayton Act prohibitions to persons and corporations "engaged in commerce [among the several States]," Congress thus may reasonably be said to have intended to reach persons or corporations whose activities, while wholly intrastate in nature, affect other States through their effects on interstate commerce.

The holding in *Transamerica Corp.* v. *Board of Governors,* 206 F. 2d 163, 166 (CA3 1953), that Congress, when it enacted the Clayton Act, desired "to exercise its power under the commerce clause of the Constitution to the fullest extent," has nothing to rebut it. Congress apparently was not as timorous as the present Court in moving against centers of economic power and practices that aggrandize it. Heretofore that is the way we have read the Clayton Act: that Act was intended to complement the Sherman Act by regulating in their incipiency actions which might irreparably damage competition before reaching the level of actual restraint proscribed by the Sherman Act, and, in the absence of some indication of legislative intent to the contrary, we should not lightly assume that Congress intended to undercut that complementary function by circumscribing the jurisdictional reach of the Clayton Act more narrowly than that of the

any such possession or place and any State or Territory of the United States or the District of Columbia or any foreign nation, or within the District of Columbia or any Territory or any insular possession or other place under the jurisdiction of the United States." 15 U. S. C. § 12.

Sherman Act.[5] See *United States* v. *Penn-Olin Chemical Co.*, 378 U. S. 158, 170–171 (1964); *United States* v. *E. I. du Pont de Nemours & Co.*, 353 U. S. 586, 589, 597 (1957); *Standard Fashion Co.* v. *Magrane-Houston Co.*, 258 U. S. 346, 355–356 (1922); S. Rep. No. 698, 63d Cong., 2d Sess., 1 (1914). And that is the way in which we assumed that the Celler-Kefauver Act in 1950, 64 Stat. 1125, 15 U. S. C. § 18, addressed itself to the problem. For we said in *Brown Shoe Co.* v. *United States,* 370 U. S. 294, 315–323 (1962), that the legislative history showed congressional concern over the "desirability of retaining 'local control' over industry and the protection of small businesses." *Id.,* at 315–316. One dramatic way of leveling local business is pulling it into a vast interstate business regime of the nature alleged in this complaint.

---

[5] Indeed, we would have to sit as a Committee of Revision over Congress, shaping the law to fit our prejudices against antitrust regulations, to hold that "in commerce" as used in the Clayton Act was intended to provide less comprehensive coverage than the language of the Sherman Act. Prior to passage of the Clayton Act, labor union practices had been held by this Court to *affect* commerce and thus to fall within the reach of the Sherman Act, despite the fact that the union activities could not be regarded as being in the flow of commerce. *Loewe* v. *Lawlor,* 208 U. S. 274, 300–301 (1908). See also *Teamsters Local 167* v. *United States,* 291 U. S. 293, 297 (1934); *Apex Hosiery Co.* v. *Leader,* 310 U. S. 469 (1940); *United States* v. *Employing Plasterers Assn.,* 347 U. S. 186, 189 (1954). If the Court is right today in saying that "in commerce" as used in the Clayton Act is to be read more restrictively than the Sherman Act, then those who drafted the Clayton Act (including Louis D. Brandeis) to protect labor were needlessly concerned—no express exemption of labor would have been necessary, since the "in commerce" language of the Clayton Act (if narrowly read) would not have supported judicial attempts to reach labor activities on an "affecting commerce" theory. The drafters obviously thought otherwise.

## I

I agree with the court below that jurisdiction may be sustained on an "in commerce" theory.[6]    Clayton Act §§ 3 and 7 apply to persons or corporations "engaged in commerce"; we have held, in a line of cases arising under the Fair Labor Standards Act (FLSA), 52 Stat. 1060, as amended, 29 U. S. C. § 201 *et seq.,* that persons or enterprises engaged in building or repairing toll roads, bridges, and canal locks are "engaged in commerce" and therefore within the reach of the commerce power, by virtue of their relationship to indispensable instrumentalities of our system of interstate commerce. *Mitchell* v. *Vollmer & Co.,* 349 U. S. 427 (1955); *Fitzgerald Co.* v. *Pedersen,* 324 U. S. 720 (1945); *Overstreet* v. *North Shore Corp.,* 318 U. S. 125 (1943).    It is true, as the majority notes, that the FLSA and the antitrust laws are different statutes, but the critical difference between the statutes arises in an area which in no way weakens the applicability of the FLSA cases to the present inquiry.

In the FLSA and in many other regulatory enactments, Congress itself has determined that certain classes of activities have a sufficient impact upon interstate commerce to warrant regulation of the entire class, regardless of whether an individual instance of the activity in question can be shown to be in or to affect commerce.    See generally *Perez* v. *United States,* 402 U. S. 146, 152–154 (1971); *United States* v. *Darby,* 312 U. S. 100, 119–121

---

[6] The decision of the Court of Appeals on the Sherman Act issue, which remains intact by virtue of our limited grant of certiorari, held that petitioners and their alleged activities were sufficiently "in commerce" to support Sherman Act jurisdiction.    487 F. 2d 202, 205 (1973).    The majority now holds, however, that petitioners and their alleged activities were *not* sufficiently "in commerce" to support Clayton and Robinson-Patman Act coverage.    In light of the latter holding, it is difficult to imagine the reception that Copp's Sherman Act claims will receive on remand.

(1941). The FLSA represents such a congressional determination with respect to the payment of wages below a specified level and with respect to employment exceeding a specified number of hours per week (under specified conditions). 29 U. S. C. §§ 206, 207. Once either of these practices is found to exist with respect to an employer or employee covered by the FLSA, the regulatory provisions of that Act are called into play without further inquiry into the possible effect of the individual employer's practices on interstate commerce.

In the antitrust laws, Congress has provided a different sort of treatment. The Sherman Act broadly prohibits practices in restraint of trade or commerce, and the Clayton and Robinson-Patman Acts bar price discrimination, tie-ins, and corporate stock or assets acquisitions where "the effect of" such practices "may be substantially to lessen competition or tend to create a monopoly in any line of commerce." The finding that a person or corporation is covered by these Acts does not trigger automatic application of the regulatory prohibition; instead, a court must go on to make an individualized determination of the actual or potential impact of that particular person's or corporation's activities on competition or on interstate commerce.[7]

It is in this respect that the antitrust laws differ from the FLSA and other regulatory enactments. The present case, however, does not turn on that difference, because it does not raise the issue of whether the actions of the

---

[7] Of course, in a limited range of Sherman Act cases, this Court has held that certain practices are *per se* violations of the antitrust laws; that is to say, these practices are conclusively presumed to be illegal without the need for any particularized inquiry into their effects. See generally *White Motor Co.* v. *United States,* 372 U. S. 253, 259–262 (1963), and cases collected therein. These cases may be viewed as limited exceptions to the individualized approach described in the text above.

named defendants had a sufficiently adverse effect on interstate commerce to make out a violation of the antitrust laws; that issue goes to the merits of Copp's claims, and cannot properly be reached at this stage. Instead, the case as now presented raises the threshold issue of whether the named defendants are within the jurisdictional reach of the antitrust laws, and our inquiry on that point does not differ significantly from our inquiry under the FLSA or any other regulatory statute. The FLSA covers employers of employees "engaged in commerce or in the production of goods for commerce"; the Clayton Act and Robinson-Patman Act provisions at issue here cover persons or corporations "engaged in commerce." We have held, in FLSA and Federal Employers' Liability Act (FELA) cases, that Congress' use of the phrase "engaged in commerce" is sufficiently broad to reach employees engaged in repairing highways or in carrying bolts to be used for bridge repairs, *Overstreet* v. *North Shore Corp., supra;* in light of the purposes of the Clayton Act, I see no reason why the phrase "engaged in commerce" as used in that Act should not be read equally broadly, and should not thereby be deemed sufficient to reach corporations engaged in building highways or in producing and supplying the very materials used in such construction. As the Court of Appeals aptly noted: "Regulation of business practices through the antitrust laws . . . may justifiably reach further than some other types of regulation because the antitrust laws are concerned directly with aiding the flow of commerce." 487 F. 2d 202, 204 (1973).

## II

An alternative ground for affirming the judgment below, likewise rejected by the majority, is that the Clayton Act's "engaged in commerce" jurisdictional language is sufficiently broad to encompass corporations which are

not in the flow of commerce itself but which, through their activities, affect commerce. For the reasons stated in the introductory portion of this opinion, I, for one, am persuaded that Clayton Act §§ 3 and 7 are as broad as the Sherman Act in this respect. The majority expressly disclaims any intent to resolve that issue on the ground that Copp has failed to produce any "proof" of such effects, and is therefore not entitled to continue this suit even under a broad reading of the jurisdictional phrase; in my view, the burden of proof which the Court thereby imposes upon Copp is one which may not properly be imposed at this stage of the litigation.

The complaint alleges the acquisition by Gulf of named companies with the purpose and effect of creating a monopoly under the Sherman Act and likewise substantially lessening competition and creating a monopoly in violation of § 7 of the Clayton Act. Like allegations are made respecting certain acquisitions of Union Oil. Allegations are made that the petitioners divide the geographic areas of competition for the purpose of eliminating competition. The petitioners are alleged to indulge in tie-in practices, whereby base rock material would be sold substantially more cheaply to contractors who buy their asphaltic concrete from the named petitioners. The complaint alleges that the petitioners have maintained high prices in areas where there is no competition and that where competition exists, they sell their products at artificially low prices—below cost—and that that is the practice of petitioners where they compete with Copp. Thus, violations of the Sherman Act, Clayton Act, and Robinson-Patman Act are alleged.

There has been no trial. The case was disposed of on pleadings and affidavits. The District Judge ordered discovery so that all the parties could "develop the facts bearing upon the question of whether the alleged con-

spiracy was one affecting interstate commerce." At the end of the time allotted for discovery, the District Court ruled that "the local activities of the defendants with regard to asphaltic concrete did not have a substantial impact on interstate commerce," and as respects one of the defendants (who is not a party in the case now before us) granted its motion for summary judgment.[8]

The Court of Appeals speaking through Judge Alfred T. Goodwin said—properly, I think:

> "Nor can we accept defendants' argument that the plaintiffs must show not only that the parties and sales are 'in' commerce but must show that competition was injured before the court has jurisdiction. This is the result of confusing the substantive with the jurisdictional requirements of the antitrust laws. It is not necessary for a plaintiff to prove his whole case in order to give the courts jurisdiction to hear it." 487 F. 2d, at 206.

The allegations and the complaint plainly gave the District Court jurisdiction.[9] What a trial on the merits might

---

[8] Federal Rule Civ. Proc. 56 "deals with the merits" of a claim and if in favor of the defendant is "in bar and not in abatement," 6 J. Moore, Federal Practice ¶ 56.03, p. 2051 (2d ed. 1974). Lack of jurisdiction of the court is a matter in abatement and thus is not usually appropriate for a summary judgment, which is not a substitute for a motion to dismiss for want of jurisdiction. *Id.*, at 2052–2053.

On the general propriety of discovery orders of this sort, see 4 *id.*, ¶ 26.56 [6]; but "[t]here are cases . . . in which the jurisdictional questions are so intertwined with the merits that the court might prefer to reserve judgment on the jurisdiction until after discovery has been completed." *Id.*, at 26–191. See also the discussion in n. 10, *infra*.

[9] The issue of whether there is subject-matter jurisdiction raises the question whether the complaint, on its face, asserts a non-frivolous claim "arising under" federal law. *Baker* v. *Carr*, 369 U. S. 186, 199–200 (1962); *Bell* v. *Hood*, 327 U. S. 678, 682–683

produce no one knows. The District Judge said: "I conclude that the local activities of the defendants with regard to asphaltic concrete did not have a substantial impact on interstate commerce." That could not possibly be said until at least the plaintiffs had offered their proof; yet, as the Court of Appeals said, the plaintiffs need not prove, on a motion that goes to the jurisdiction of the court, the merits of their case in order to obtain an opportunity to try it.[10]

---

·(1946). If such a claim is stated, the District Court is then empowered to assume jurisdiction and to determine whether the claim is good or bad, on the basis of a motion to dismiss for failure to state a claim or cause of action. *Romero* v. *International Terminal Operating Co.*, 358 U. S. 354, 359 (1959); *Montana-Dakota Utilities Co.* v. *Northwestern Public Service Co.*, 341 U. S. 246, 249 (1951). Such a dismissal is on the merits, not for want of jurisdiction. *Bell* v. *Hood, supra.*

[10] It is sometimes said that where the district court's jurisdiction is challenged, that court has the power, either on its own motion or on motion of a party, to inquire into the facts as they exist for purposes of resolving the jurisdictional issue. *Land* v. *Dollar*, 330 U. S. 731, 735 n. 4 (1947), and cases cited; *Local 336, American Federation of Musicians* v. *Bonatz*, 475 F. 2d 433, 437 (CA3 1973). On the other hand, if the jurisdictional issue is closely intertwined with or dependent on the merits of the case, the preferred procedure is to proceed to a determination of the case on the merits. *McBeath* v. *Inter-American Citizens for Decency Comm.*, 374 F. 2d 359, 362–363 (CA5), cert. denied, 389 U. S. 896 (1967); *Jaconski* v. *Avisun Corp.*, 359 F. 2d 931, 935–936 (CA3 1966).

The cases cited for the proposition that a district court may inquire into jurisdictional facts on a motion to dismiss for want of jurisdiction are cases in which the jurisdictional issue was whether the plaintiff met the amount-in-controversy requirement. That jurisdictional issue is sufficiently independent of the merits of the claim to warrant independent examination, if challenged. Where the jurisdictional issue is more closely linked to the merits, disposition of the jurisdictional issue on motion becomes inappropriate. Thus in *Land* v. *Dollar*, where the complaint alleged that members of the United States Maritime Commission were unlawfully holding

shares of Dollar stock under a claim that the stock belonged to the United States, the District Court dismissed on the ground that the suit was against the United States. In affirming a reversal of that dismissal, the Court said: "[A]lthough as a general rule the District Court would have authority to consider questions of jurisdiction on the basis of affidavits as well as the pleadings, this is the type of case where the question of jurisdiction is dependent on decision of the merits." 330 U. S., at 735. This was true because if the plaintiffs prevailed on either of their theories on the merits (that the Commission was without authority to acquire the shares, or that the contract was simply a pledge of the shares rather than an outright transfer), then they would also prevail on the jurisdictional issue. And in the *McBeath* case, *supra*, the Court of Appeals for the Fifth Circuit reversed a pretrial dismissal of a Sherman Act claim on grounds of lack of jurisdiction (for failure to show an effect on interstate commerce). Relying on *Land* v. *Dollar*, it held that the issue of effects on interstate commerce was so intertwined with the merits of the claim that it was error for the District Court to dismiss without giving the plaintiff a full chance to prove his case on the merits.

In cases such as *United States* v. *Employing Plasterers Assn.,* 347 U. S. 186 (1954); *Mandeville Island Farms* v. *American Crystal Sugar Co.,* 334 U. S. 219 (1948); and *United States* v. *Yellow Cab Co.,* 332 U. S. 218 (1947), this Court has reviewed "interstate commerce" issues in the context of dismissals of antitrust suits prior to trial on the merits. Those dismissals, however, were based, not upon motions for summary judgment or for dismissal for want of jurisdiction, but rather upon motions to dismiss for failure to state a claim. In such cases, of course, the allegations of the complaint must be taken as true. *Id.,* at 224. In the case now before us, the District Court clearly went beyond the face of the complaint and required respondents to produce *proof* of interstate effects.