597 F.2d 1318
 1979-1 Trade Cases 62,599
 MAC ADJUSTMENT, INC., an Oklahoma Corporation, and B. J.
Gosting, Plaintiffs-Appellants,
v.
GENERAL ADJUSTMENT BUREAU, INC., a New York Corporation, and
Property Loss Research Bureau, an Unincorporated
Association, Defendants-Appellees.
 No. 77-1986.
 United States Court of Appeals,
Tenth Circuit.
 Submitted on Briefs March 12, 1979.
Decided April 30, 1979.
Rehearing Denied May 30, 1979.
 
 Jack N. Shears of Shears & Shears, Ponca City, Okl., for plaintiffs-appellants.
 D. Kent Meyers, Jim K. Goodman and John J. Love of Crowe, Dunlevy, Thweatt, Swinford, Johnson & Burdick of Oklahoma City, Okl., and Clarence W. Olmstead, Jr. of Shearman & Sterling, New York City, for defendant-appellee General Adjustment Bureau, Inc.
 Terry W. Tippens and Margaret McMorrow Love of Fellers, Snider, Blankenship & Bailey, Oklahoma City, Okl., for defendant-appellee Property Loss Research Bureau.
 Before McWILLIAMS and DOYLE, Circuit Judges, and MARKEY, Chief Judge.*
 WILLIAM E. DOYLE, Circuit Judge.
 
 
 1
 This is an antitrust action which is alleged to have arisen under Section 1 of the Sherman Act, 15 U.S.C. § 1. The trial court decided the case after a pretrial conference and after hearing evidence on a limited aspect of the case, namely, whether or not there was sufficient impact on interstate commerce to justify the assumption of jurisdiction on its part. The court held, following the hearing, that there was insufficient evidence to support a finding that the acts of the defendants had a substantial effect on interstate commerce. It sustained the defendants' motions for summary judgment which had been filed.
 
 
 2
 The testimony given was that of the plaintiff Gosting, the president of Mac Adjustment, Inc. (Mac), alone and it pertained to the extent to which his business was in commerce. Apparently the trial court concluded that his activities were not sufficiently extensive to be regarded as being substantially involved in commerce.
 
 
 3
 The plaintiffs' theory of the case is set forth in a general way in the complaint. It alleged that the defendants conspired to eliminate Mac's business as an independent insurance adjuster. The General Adjustment Bureau, Inc. (GAB), one of the defendants, operates an insurance adjustment business throughout the United States. Property Loss Research Bureau, the other defendant, is an unincorporated association of some 100 insurance companies. One of the association's members was Iowa Mutual Insurance Company.
 
 
 4
 The allegation in the complaint is that the defendants acted in concert to coerce insurance companies, including Iowa Mutual, not to use Mac as an independent adjuster. It is alleged that this coercion was successful as a result of the issuance of false statements by GAB in which it was claimed that the plaintiff was too generous in adjusting losses, in particular the losses from a storm in Tonwaka, Oklahoma, in November of 1973. It is alleged that these statements were made to Iowa Mutual, Southwest Adjustment Company (a company which provided about 75% of Mac's business), various insurance agents, and some individual insureds. Most of the storm losses were covered by Iowa Mutual. The defendant GAB was engaged to audit and readjust plaintiffs' previous adjustments of these losses. The conspiracy to destroy the plaintiffs' business allegedly resulted from a series of meetings which took place in relationship to this auditing procedure.
 
 
 5
 Mac Adjustment was started in 1972, after GAB terminated Mr. Gosting's employment. It had prospered until late 1973, and thereafter the business declined, until by 1976 there was almost nothing remaining. Another allegation in the complaint was that plaintiffs were deprived of a listing in a trade publication which would have served to notify the trade that Gosting was in business. GAB refused to verify Gosting's having been employed as a GAB adjuster from 1963 to 1972.
 
 
 6
 Also, GAB and the insurance companies allegedly agreed to uniform practices and procedures to be used in the adjustment and settlement of claims. These standards and the "quality control checks" GAB performed on other adjusters allegedly gave GAB an unfair advantage.
 
 
 7
 Due to the fact that the complaint was vague as to the extent to which Mac was engaged in interstate commerce, the trial court, following a pretrial conference, decided that since it was a jurisdictional matter, evidence should be offered at a special hearing on this question.
 
 
 8
 On September 15, 1977, the testimony of Mr. Gosting was given before the trial court in Oklahoma City. The testimony generally addressed the question whether the plaintiffs were actually engaged in interstate commerce. He testified that he represented 180 insurance companies. A large number of these representations were obtained through Southwest Adjustment with which he had a business connection, and from this connection investigations were apparently referred to Mac. Gosting testified that a vast majority of these companies were in states other than Oklahoma where his office was located.
 
 
 9
 One gets the impression from reading the testimony that most of Mac's investigations were conducted inside Oklahoma, although some of the work was indeed outside of Oklahoma, but Mac did have this contractual agreement for adjustment services with Southwest Adjustment Company. Gosting spoke of representing a number of insurance companies who had offices outside of Oklahoma which required him to go to their home offices from time to time. Mac had written contracts with adjusting companies from other states, but there were few written contracts with insurance companies, if any. These tended to be oral.
 
 
 10
 Gosting testified that his company agreed with the insurance companies it represented to go anywhere in the world for adjustment purposes, but he quickly admitted that it would not be feasible for him to pursue an investigation in Australia and that it would be better to have a local agent do it.
 
 
 11
 In answers to interrogatories it was shown that Mac competed with adjusting firms in Oklahoma, but Mac could not point to any firms outside of Oklahoma with which it had competed. The only state in which Gosting was licensed as an insurance adjuster was Oklahoma, but there were some kinds of arrangements which allowed him to function in other states even though he did not have a license issued from other states. He could do this on the basis of having the license in Oklahoma. He persisted, however, in contending that it was necessary to travel across state lines in some of his investigations of storms, fires, and automobile losses. However, a review of the exhibits shows that only 18 adjustments, at the most out of 1400 or 1500 required Gosting or Mac's employees to travel outside of Oklahoma. The out-of-state assignments, for the most part, were trips to neighboring Kansas. Additional cases involved telephone calls for mail across state lines as commerce. Some of the assignments completed in Oklahoma involved adjustments on shipments which had come from outside Oklahoma and had come to rest there.
 
 
 12
 The appellants, Mac and Gosting, maintain that the adjustment and settlement of claims is an integral part of the insurance business. Accordingly, since many insurance companies conduct their business in commerce by soliciting policies, collecting premiums, and paying claims outside of Oklahoma and in other states, the adjustments made by Mac must be regarded as an integral part of the interstate insurance business.
 
 
 13
 It is not too simple or easy to link the insurance business with interstate commerce. For a long time, the position that the Supreme Court took was that the insurance business was not interstate commerce. However, in 1944, it decided United States v. South-Eastern Underwriters Ass'n, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944), which held that the insurance business, although not necessarily in interstate commerce, could be engaged in this kind of commerce. There the charge was that there existed a conspiracy to fix insurance rates in a number of states, and the simple question was whether the Sherman Act prohibited this. The district court had held that the Sherman Act did not apply since the insurance business did not constitute trade or commerce within the meaning of the commerce clause. The Supreme Court had to decide this exact question. The price-fixing activities affected commerce because premiums were collected, policies were transmitted, and claims were paid throughout the United States. Also, a nationwide business was not deprived of its interstate character merely because it was built on local sales contracts with policyholders. So, the thrust of the Supreme Court's decision was that under the evidence before it, South-Eastern Underwriters Ass'n was engaged in commerce and was subject to the Sherman Act. It is not, however, an across-the-board decision and therefore had a tendency to be restrictive.
 
 
 14
 In any event, Congress enacted the so-called McCarran-Ferguson Act, 15 U.S.C. § 1011 Et seq., the purpose of which was to guarantee that states could continue to regulate the insurance rates. This measure also provided that the Sherman Act applied to the business of insurance only to the extent that such business was not regulated by state law. The Act also provided an exception, whereby the Sherman Act continued to apply to an agreement to boycott, coerce or intimidate in relation to the business of insurance. See 15 U.S.C. § 1013(b). It is this boycott aspect and coercion feature that the plaintiffs rely on and emphasize. Mac contends that the defendants-appellees used fraud and deceit in order to destroy its business.
 
 
 15
 The main injury complained of was that Mac's business gradually diminished as a result of GAB communicating to an insurance trade association, companies, and agents that Mac's adjustment work was incompetent and dishonest and that Mac oversettled claims or (in other words) paid too much.
 
 
 16
 The essence of the trial court's decision was that the plaintiffs were not in the business of insurance as that is defined by the Supreme Court, and so the consequence would be that the restraints were not beyond the reach of the Sherman Act because of any exemption under the McCarran-Ferguson Act. This particular ruling has not been appealed.
 
 
 17
 The ruling that the plaintiffs are not in the business of insurance for the purpose of the McCarran-Ferguson Act creates somewhat of a difficulty because, as a consequence, they must establish that they are in the business of insurance in order to satisfy the interstate commerce requirement of the Sherman Act. It is, of course, possible to argue that the insurance adjustment business is independent of the Supreme Court's decision in South-Eastern Underwriters Ass'n, supra, that the McCarran-Ferguson Act does not apply and that Mac was engaged in interstate commerce, but there is a question as to whether anything is gained by taking this tack because you cannot get away from the fact that this is, if not the insurance business, so closely related to it that it is not distinguishable from it. So, the commerce element is more likely present by the treating of insurance as commerce.
 
 
 18
 The difficulty which we find with the judgment is that there is not any evidence to review to speak of because the only testimony that was offered was that of Mr. Gosting in a special hearing that grew out of the filing of the motions for summary judgment. The purpose of the hearing in the trial court was to determine whether or not the plaintiffs were engaged in interstate commerce and whether the activity had a substantial impact or effect on the commerce. No doubt the ultimate question is whether this was an atmosphere of commerce so that the alleged restraints or obstructions on Mac's business created a sufficient impact on commerce. It is rendered all the more complex by the fact that the trial court appeared to be requiring a great impact on commerce, one that this small company was incapable of producing. Certainly the effect on commerce cannot be tremendous in a total social sense if the company which is the object of the conspiracy is small. Nevertheless, if the company is engaged in interstate commerce, it is entitled to the protection of the antitrust law, and particularly so if the conspiracy succeeded in putting it out of business. See, e. g., Hospital Building Co. v. Trustees of Rex Hospital, 425 U.S. 738, 745-46, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976); DeVoto v. Pacific Fidelity Life Insurance Co., 516 F.2d 1 (9th Cir.), Cert. denied, 423 U.S. 894, 96 S.Ct. 194, 46 L.Ed.2d 126 (1975); Yellow Cab Co. v. Cab Employers, Automotive & Warehousemen, Local # 881, 457 F.2d 1032 (9th Cir. 1972).
 
 
 19
 The testimony of Mr. Gosting is not satisfactory because it is limited to the kinds of activities in which he engaged how frequently he traveled to other states, why he did so, what he did in these other states and so on, but it did not deal at all with the injuries that were allegedly inflicted by the defendants and so that facet of effect upon commerce was not explored at all.
 
 
 20
 A further problem is that the judgment of the district court contained no findings of fact. It merely concludes in most general terms that there was not a substantial impact on commerce. The wording of that final decree is such that one gets the impression that it had to be an impediment of a very major kind in order for the plaintiffs to prove a case. Actually if the plaintiffs were able to establish an unreasonable restraint on interstate commerce, and were able to establish that they were engaged in interstate commerce, then they would be entitled to go to the jury or to have the court consider the matter of establishing liability. The narrowness of the hearing leaves a reviewing court with a question whether other evidence existed which, if the trial had been full-scale, would have produced a prima facie showing.
 
 
 21
 There is, of course, no provision in the Rules of Civil Procedure for having a hearing of the kind that was here conducted, that is, an In limine hearing to decide whether or not the plaintiffs could sufficiently satisfy the jurisdictional requirement of being engaged in interstate commerce so as to justify going to trial.
 
 
 22
 Our disposition is, therefore, to remand the case for further proceedings to enable the trial court to take any further action that may be necessary in order to prepare the case for trial or to give, at least, the plaintiffs an opportunity to make a further showing if they have additional evidence which would add to this picture of carrying on business in interstate commerce and of the defendants restraining the flow or substantially affecting interstate commerce.
 
 
 23
 The judgment here was entered pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. It was not, however, an orthodox summary judgment proceeding in that an evidentiary hearing was held. It is fundamental that summary judgment is appropriate if and only if there is no genuine issue as to any material fact. Only then is the moving party entitled to a judgment as a matter of law. What we are saying above is that the record does not demonstrate that there exists no genuine issue as to any material fact whereby the movants would be entitled to judgment as a matter of law. When such an issue of fact is present, summary judgment is not appropriate.
 
 
 24
 In the case at bar the issues whether the plaintiffs-appellants were engaged in interstate commerce and whether the impact on commerce was substantial are connected and considered singly or together are factual.
 
 
 25
 The summary judgment rule in an antitrust case is that the summary procedures are to be used sparingly. Thus
 
 
 26
 Where it (the record) establishes a Per se violation of the anti-trust laws, summary judgment is proper, but, in other situations, where the impact of the alleged violation is too little known, and the bare bones of the paper record are insufficient to pass judgment thereon, a trial should be had. Both factual inferences and the record as a whole must be viewed in the light most favorable to the party opposing summary judgment. And summary procedures should be used sparingly in complex anti-trust litigation where motive and intent play leading roles, or the proof is in the hands of the movant.
 
 
 27
 6 Moore's Federal Practice P 56.17(5), at 56-741 to 56-743 (2d ed. 1976). The record in this case is, to say the least, sketchy and it fails to demonstrate beyond a reasonable doubt that there is no question of fact to be tried.
 
 
 28
 The Supreme Court in recent opinions has considered what is necessary in order to satisfy the commerce requirement of the Sherman Act. Thus in Hospital Building Co. v. Trustees of Rex Hospital, 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976), the Supreme Court held that:
 
 
 29
 It is settled that the Act (Sherman Act) encompasses far more than restraints on trade that are motivated by a desire to limit interstate commerce or that have their sole impact on interstate commerce. "(W)holly local business restraints can produce the effects condemned by the Sherman Act." United States v. Employing Plasterers Ass'n., 347 U.S. 186, 189 (74 S.Ct. 452, 454, 98 L.Ed. 618, 623) (1954). As long as the restraint in question "substantially and adversely affects interstate commerce," Gulf Oil Corp. v. Copp Paving Co., 419 U.S. 186, 195 (95 S.Ct. 392, 398, 42 L.Ed.2d 378, 386) (1974); Mandeville Island Farms, Inc. v. American Crystal Sugar Co., 334 U.S. (219) at 234 (68 S.Ct. 996, 92 L.Ed. 1328), the interstate commerce nexus required for Sherman Act coverage is established. " 'If it is interstate commerce that feels the pinch, it does not matter how local the operation which applies the squeeze.' " Gulf Oil Corp. v. Copp Paving Co., supra (419 U.S.) at 195 (95 S.Ct., at 398, 42 L.Ed.2d, at 386), quoting United States v. Women's Sportswear Assn., 336 U.S. 460, 464 (69 S.Ct. 714, 93 L.Ed. 805) (1949). . . . It was sufficient for us that the allegations in the complaint, if proved, could show that the conspiracy resulted in "Unreasonable burdens on the free and uninterrupted flow of plastering materials into Illinois." 347 U.S., at 189 (74 S.Ct. 452). (emphasis added).
 
 
 30
 425 U.S. at 743, 746, 96 S.Ct. at 1851-1853.
 
 
 31
 In Goldfarb v. Virginia State Bar, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), the Supreme Court considered the interstate commerce requirement where the activity restrained (title examination) was an integral part of the transaction (financing home purchases). In that case significant amounts of the loan money came from outside the state, and the lenders required a title examination before loans could be granted.
 
 
 32
 These two cases we regard as valuable in determining the applicable commerce standards required by the Sherman Act.
 
 
 33
 In addition to those cited in the Hospital Building Co. and Goldfarb cases, there is a decision of the Third Circuit, Mortensen v. First Federal Sav. and Loan Ass'n, 549 F.2d 884 (3d Cir. 1977), which is useful and should prove to have value on remand, for Mortensen considered the jurisdiction problem arising from treating interstate commerce and the impact on commerce as a jurisdictional matter and as an element in a Section 1 Sherman Act case. The framework of the opinion is not unlike that at bar because it was disposed of by the district court on a motion for summary judgment. The opinion of the appellate court was written by Judge Hunter. It was painstaking and careful. It considered at length the commerce problem in an antitrust case as it affects jurisdiction and as it affects the merits.
 
 
 34
 Based upon the foregoing, the judgment of the district court is reversed, and the cause is remanded for further proceedings consistent with the views expressed herein.
 
 
 
 *
 Of the United States Court of Customs and Patent Appeals, sitting by designation