**ROTEC INDUSTRIES, INC. an Illinois Corporation, Plaintiff,**

**v.**

**MITSUBISHI CORPORATION, a Corporation organized under the laws of Japan; Tucker Associates, Inc., an Oregon Corporation; and Garry Tucker, an individual, Defendants.**

**No. CIV. 00–1394–KI.**

United States District Court, D. Oregon.

Sept. 14, 2001.

Jeffrey S. Love, Klarquist Sparkman Campbell Leigh & Whinston, LLP, Portland, OR, George P. McAndrews, Matthew G. McAndrews, Dean A. Pelletier, James R. Nuttall, McAndrews, Held & Malloy, Ltd., Chicago, IL, for Plaintiff.

Paul Fortino, Anne L. Nichol, Perkins Coie LLP, Portland, OR, Michael O. Warnecke, Debra Rae Bernard, Mayer, Brown & Platt, Chicago, IL, for Defendants.

## OPINION

KING, District Judge.

This action concerns the Three Gorges Dam project ("Project") on the Yangtze River in China. When completed, the Three Gorges Dam will be the largest hydropower project in the world. It is being built in multiple stages, beginning in 1993 with completion expected in 2009. Stage I of the Project involved excavating and diverting the Yangtze River into a side channel. It was completed in 1997. Stage II involves construction of a large portion of the main section of the dam. It requires the placement of a huge volume of concrete.

Plaintiff Rotec Industries, Inc. ("Rotec"), and defendant Mitsubishi Corporation competed for contracts awarded for the purchase of equipment to place concrete in Stage II of the Project. The equipment contracts were split between the two companies. Rotec's claims concern conduct leading up to the award of these contracts, allegedly including bribery in the form of monetary payments and a job offer made to a man on the Bid Evaluation Committee. Before the court is defendant Mitsubishi Corporation's motion to dismiss and/or for summary judgment (# 23) and Tucker defendants' motion to dismiss and/or for summary judgment (# 27). For the reasons below, I grant summary judgment against the federal statutory claims and deny the motions against the state tort claim.

## FACTS

Plaintiff Rotec, based in Illinois, designs, manufactures, sells, leases, and services heavy construction machinery, including the Tower Belt, a crane-based concrete conveyor system. Defendant Mitsubishi Corporation, based in Japan, engages in construction projects but does not design or manufacture equipment. Mitsubishi teamed with CS Johnson, an American company, and Potain, a French company, on the Project. Defendant Garry Tucker is president of defendant Tucker Associates, Inc. (jointly, "Tucker defendants"), an engineering consulting company based in Oregon. Tucker Associates was a consultant to CS Johnson on the Project.

China Yangtze Three Gorges Project Development Corporation ("China Three Gorges Development") is the owner of the Project. China Resources National Corporation and China Resources Machinery Corporation, two separate corporations, are subsidiaries of China Resources (Holdings) Co., Ltd. All of these Chinese entities are owned in whole or in part by the Chinese government.

CS Johnson hired Arvin Yu, a Chinese national, to be its sales agent in China. Yu also traveled with Tucker in China to

act as his interpreter. Tucker described Yu as CS Johnson's "eyes and ears in China," providing information on various construction projects that he received from the Chinese government and other sources.

Mitsubishi began pursuing sales at the Project in 1992. It supplied numerous types of construction equipment in Stage I, including excavators, dump trucks, passenger buses, and a concrete batching plant.

In 1994 during Stage I of the Project, Rotec supplied one Tower Belt and two cranes, as well as trucks, associated equipment, and spare parts.

Also in 1994 during Stage I of the Project, CS Johnson sold a concrete batching plant to the Project. Tucker was consulting for CS Johnson at that time. One of CS Johnson's contacts at China Three Gorges Development for the batching plant was Zhuang Ming Xiang, a member of the Bid Evaluation Committee. The Bid Evaluation Committee, made up of at least 60 people, was responsible for evaluating and comparing the bids for the Project, including the concrete conveyor systems to be purchased in Stage II.

In connection with the Stage I batching plant contract, CS Johnson needed a person to supervise the quality of the steel being fabricated in China. In early 1995, Zhuang Ming Xiang was critical of the CS Johnson design drawings made pursuant to the contract.

■ On June 8, 1995, Arvin Yu sent a fax to Tucker in which he relays a message from Ruan Guanghua, a senior consultant of China Three Gorges Development and member of the Evaluation Committee, stating:

I am working for review and revising the tendering documents on *Proposal Concrete Conveying System and Placement.*

In the 3GPC working group, every one knows that C.S. Johnson will cooperate with Potain for now, no bad comment on CSJ but Mr. Zhuang Mingxiang, he complained and made bad words. "CSJ design drawings is delay and could not satisfy requirement, less details."

I know that Mr. Zhuang Mingxiang hopes to take fabrication QC, but to quote price and sign official contract with CSJ for him is dangerous. So, he will never quote price directly.

So, I think you should to close Zhuang's mouth with QC job, and the contract or agreement has to be through Third Party. It's safety for Zhuang. The high level leaders are impressed with Zhuang's comment, as he is Machinery Department Manager.

Bernard Decl. Ex. 39 (emphasis in the original)[1]. A few weeks later, Tucker, on behalf of CS Johnson, authorized Zhuang Ming Xiang to be its quality control representative on the batching plant contract. Tucker is not sure if the position was compensated or not.

Tucker testified that they offered the CS Johnson quality control job to Zhuang Ming Xiang so that he would stop being critical of CS Johnson. He also maintains that the job offer had nothing to do with the upcoming bids for the Stage II contracts. Rotec alleges that Tucker offered Zhuang Ming Xiang the quality control job as a form of bribery to stop his criticism of CS Johnson and to influence him as a member of the Evaluation Committee as it was preparing to work on Stage II bids.

---

**1.** I conclude that the fax is not inadmissible hearsay when offered to prove Tucker's state of mind prior to making the job offer.

In August 1995, China Three Gorges Development announced that it was soliciting bids for the Stage II concrete placement equipment for the Project.

On November 1, 1996, Rotec contracted with China Resources National to sell it three Tower Belts, two cranes, and associated equipment and services for a total contract price of $30,515,319.

In a contract dated December 16, 1996, Mitsubishi, as the Seller, contracted with China Resources National, the Buyer, to sell two Top Belt systems, designed and manufactured by Potain and CS Johnson. The Top Belt equipment was to be manufactured in France, Japan, and China. The Top Belt system consisted of a Top Belt Conveyor provided by CS Johnson and a Tower Crane provided by Potain. The contract price, including associated equipment and services, was $17,825,190. An Appendix to the December 1996 contract contains a table of tools needed for dismantling, assembling, and maintenance. The list consists mostly of hand tools such as hammers and wrenches for a total FOB price of $51,608.36, to be supplied by CS Johnson. The table has column headings of "Unit Price FOB USA" and "Ext Price FOB USA." Tucker testified that the Chinese demanded that the tools come from the United States.

Also on December 16, 1996, Mitsubishi executed an addendum requiring it to pay 0.5% of the contract price, or $89,126, to China Resources National. The addendum requires the commission to be paid to the buyer's account in a bank in Hong Kong with an account name of China Resources Machinery. Wu Jun executed the addendum on behalf of China Resources National. Payment is not due until seven days after Mitsubishi's receipt of payment from China Resources National. There is no evidence that Mitsubishi has been paid in full yet or that Mitsubishi paid the 0.5% commission payment yet. Shigeo Mizutani, the person in charge of Mitsubishi's Stage II construction efforts at the Project, executed the addendum on behalf of Mitsubishi. He testified that the commission was payment for China Resources National's services as a payment agent for China Three Gorges Development.

Tucker testified that there was talk of payment in the nature of bribes made by Arvin Yu but that he does not know of any payments made to anybody. He and the CS Johnson president told Arvin Yu that they would not be privy to any knowledge about what was going on after they sold equipment to Arvin Yu. He also testified:

Q. Did you state that you knew that Yu made payments to government officials for the batch plants?

A. Mr. Yu made payments to people. I do not know who they were.

Q. How do you know he made payments to people?

A. Supposition on my part.

Q. Based on what?

A. I could not recollect at this time.

Q. Is it fair to say that you knew that Mr. Yu was what we term a bag man for payments to Chinese officials?

MR. WARNECKE: Objection.

THE WITNESS: Never heard him called that before.

BY MR. McANDREWS: (continuing)

Q. No. Well, you said you made a supposition. Did you suppose that Mr. Yu was making payments to friends on the evaluation committees?

A. I had reason to believe that there was money that was being passed around to various people.

Tucker Depo. at 155–56.

CS Johnson went bankrupt in 1997 and ceased operations. It was replaced by a Japanese conveyor manufacturer prior to the manufacture of the two Top Belt sys-

tems sold by Mitsubishi to China Resources National.

## LEGAL STANDARDS

After a discussion with the attorneys at the oral argument, I informed them that I would treat the motions against all claims as motions for summary judgment.

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R.Civ.P. 56(c). The initial burden is on the moving party to point out the absence of any genuine issue of material fact. Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). On a motion for summary judgment, the evidence is viewed in the light most favorable to the nonmoving party. *Robi v. Reed,* 173 F.3d 736, 739 (9th Cir.), *cert. denied,* 528 U.S. 952, 120 S.Ct. 375, 145 L.Ed.2d 293 (1999).

## DISCUSSION

### I. *Robinson–Patman Act*

Section 2(c) of the Robinson–Patman Act states:

It shall be unlawful for any person engaged in commerce, in the course of such commerce, to pay or grant, or to receive or accept, anything of value as a commission, brokerage, or other compensation, or any allowance of discount in lieu thereof, except for services rendered in connection with the sale or purchase of goods, wares, or merchandise, either to the other party to such transaction or to an agent, representative, or other intermediary therein where such intermediary is acting in fact for or in behalf, or is subject to the direct or indirect control, of any party to

such transaction other than the person by whom such compensation is so granted or paid.

15 U.S.C. § 13(c).

Rotec alleges that the 0.5% commission Mitsubishi agreed to pay comprises a commercial bribe or an illegal brokerage in violation of § 2(c) of the Robinson–Patman Act.

Mitsubishi contends the commission was a negotiated price reduction. It argues that the Robinson–Patman § 2(c) claim fails for several reasons: (1) none of the conduct occurred in the course of commerce so there is no subject matter jurisdiction; (2) none of the acts constitute commercial bribery as prohibited by the Act; (3) no payment was ever made; (4) the transaction was not in connection with the sale or purchase of goods; and (5) payment was made to the buyer rather than an agent.

### A. *Abandoned Claims*

Rotec confirmed that it has abandoned the following claims, which are all dismissed.

Under the Robinson–Patman Act: (1) Mitsubishi's overt expression of willingness to pay a commission to China National Machinery; (2) Mitsubishi's overt expression of willingness to enter into an illegal joint venture with China Resources Machinery; (3) Tucker's award of a quality control position to Zhuang Ming Xiang; and (4) Tucker's knowledge of Arvin Yu's payments to various people in China. Thus, no Robinson–Patman Act claims remain against the Tucker defendants. The single Robinson–Patman Act claim against Mitsubishi concerns the 0.5% commission Mitsubishi agreed to pay.

### B. *Engaged in Commerce*

Mitsubishi contends that the conduct at issue all occurred in China and took place

between a Japanese company and a Chinese company. Thus, it contends that none of the allegedly unlawful activity occurred in the course of commerce as defined in the Act. Mitsubishi argues that an effect on commerce is not sufficient to invoke jurisdiction under the Robinson–Patman Act, even though it is sufficient under other antitrust acts, such as the Sherman Act. It contends that to meet the jurisdictional prerequisite in the Robinson–Patman Act, defendants must be engaged in commerce with respect to the particular conduct alleged to violate the Act and the conduct must occur in the course of that commerce.

Rotec contends that § 2(c) is interpreted more broadly than § 2(a), from which defendants draw parallels. Because of the differences in the two sections of the statute, Rotec notes that courts have applied § 2(c) and held that wrongful conduct satisfies its "course of commerce" requirement, even if the conduct itself does not constitute a transaction in commerce as defined by the Act. Influence on such interstate commerce can be sufficient to establish jurisdiction. Moreover, Rotec identifies in Mitsubishi's contract 58 categories of goods to be shipped from the United States to China.

Mitsubishi replies that the American goods are $51,608[2] of hand tools such as hammers which were never supplied because CS Johnson went bankrupt shortly after the contract was executed. The tools were ultimately supplied by a Japanese company. Mitsubishi also notes that the hand tools, from CS Johnson, were not mentioned in the addendum which obligated Mitsubishi to pay the 0.5% commission to China Resources National. It contends that the hand tools have no relevance to whether the allegedly unlawful activity itself, the 0.5% commission payment from Mitsubishi, occurred in the course of commerce as defined by the Act. They also argue that the cases relied upon by Rotec have limited validity in light of more recent Supreme Court cases, specifically Rotec's argument that an influence on commerce is sufficient.

■ The jurisdictional analysis is based on the phrase in the Act regulating certain conduct of "any person engaged in commerce, in the course of such commerce." I proceed with the analysis in light of the Supreme Court's recent comment that the phrase "engaged in commerce" is "a term of art indicating a limited assertion of federal jurisdiction." *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 121 S.Ct. 1302, 1309, 149 L.Ed.2d 234 (2001) (interpreting the Federal Arbitration Act, quoting *United States v. American Building Maintenance Industries*, 422 U.S. 271, 279–80, 95 S.Ct. 2150, 45 L.Ed.2d 177 (1975)).

The Robinson–Patman Act uses the definition of commerce found in the Clayton Act: "trade or commerce among the several States and with foreign nations[3]. . . . ." 15 U.S.C. § 12(a).

Here, the commission was to take place between two foreign companies, was negotiated overseas, was executed overseas, and was to be paid overseas. The concrete conveyor systems were manufactured overseas and installed overseas. The only direct tie to commerce with the United States are the hand tools specified in the addendum. The Ninth Circuit recognizes a *de minimis* exception to jurisdiction under the Robinson–Patman Act. Interstate sales which are merely "inad-

---

**2.** Plus $3,000 for shipping costs.

**3.** The rest of the definition, concerning the District of Columbia and territories and pos-

sessions of the United States, is not implicated here.

vertent or incidental to a pattern of intrastate sales might justify application of a *de minimis* rule." *Zoslaw v. MCA Distributing Corporation,* 693 F.2d 870, 880 (9th Cir.1982) (omitting internal quotation), *cert. denied,* 460 U.S. 1085, 103 S.Ct. 1777, 76 L.Ed.2d 349 (1983). The court held that drop sales justified application of *de minimis* principles due to their relative size and sporadic nature, making them appear as an anomaly in the normal distribution pattern. *Id.* at 881. Rotec relies on *De Modena v. Kaiser Foundation Health Plan, Inc.,* 743 F.2d 1388 (9th Cir.1984), *cert. denied,* 469 U.S. 1229, 105 S.Ct. 1230, 84 L.Ed.2d 368 (1985), which states that the term "de minimis generally refers to the effect of a violation, not to the proportion of a party's conduct which violates the law as compared to that which does not." *Id.* at 1394. I see no reason to distinguish between intrastate sales and foreign sales. If anything, the argument to apply a *de minimis* standard is stronger for foreign sales.

I do not interpret the "FOB USA" table headings in the addendum to be a contractual obligation that the hand tools be manufactured in the United States. I interpret it only as a price term. The contract contains a merger clause in ¶ 3, page 5. Thus, Tucker's testimony that the Chinese demanded the hand tools be American is of no consequence. There is no evidence that the award of the contract was affected in any way by the expectation that hand tools be provided from the United States. Importantly, the hand tools were ultimately provided from Japan.

I conclude that the hand tools were only incidental to the otherwise completely overseas sale. *De minimis* principles are appropriately applied. I will not consider the hand tools when determining if the court has jurisdiction under the Robinson–Patman Act.

Rotec's jurisdictional analysis relies on *Rangen, Inc. v. Sterling Nelson & Sons, Inc.,* 351 F.2d 851 (9th Cir.1965), *cert. denied,* 383 U.S. 936, 86 S.Ct. 1067, 15 L.Ed.2d 853 (1966). Both Nelson and its competitor, Rangen, were engaged in the sale of fish food in several states. Nelson alleged that Rangen violated § 2(c) of the Robinson–Patman Act by bribing the superintendent of an Idaho fish hatchery, the person responsible for the nutritional value of fish food used by the State. In exchange, the superintendent would use his best efforts to steer Idaho's fish food business to Rangen. Rangen prepared its fish supplement sold to Idaho at its plants in Idaho, added other components at its plant in Idaho, and delivered it to a fish hatchery in Idaho. No sale to the State crossed state lines, the fish food was consumed within Idaho, and Rangen was paid by check from the state capital at Boise. *Id.* at 860. The court reasoned that Rangen was better able to compete in its interstate business because it received an unfair preference in the intrastate Idaho business. This advantage in its own interstate dealings was critical to the court's holding that the Robinson–Patman Act applied. *Id.* at 861.

Mitsubishi argues that *Gulf Oil Corporation v. Copp Paving Company, Inc.,* 419 U.S. 186, 95 S.Ct. 392, 42 L.Ed.2d 378 (1974), removed all precedential value from *Rangen. Gulf Oil* concerns a California "hot plant" which makes asphaltic concrete for surfacing highways. The product cannot be sold profitably more than 35 miles from its manufacturing plant due to its weight and temperature requirements. Plaintiff sued its competitor, alleging a price discrimination violation of § 2(a) of the Robinson–Patman Act, among other antitrust claims. Section 2(a) forbids

"any person engaged in commerce, in the course of such commerce" to discriminate in price "where either or any

of the purchases involved in such discrimination are in commerce" and where the discrimination has substantial anticompetitive effects "in any line of commerce."

15 U.S.C. § 2(a); *Id.* at 194, 95 S.Ct. 392. The Court reversed the Circuit court's holding that the jurisdictional requirements were satisfied by the fact that the intrastate sales of asphaltic concrete were made for use in the construction of interstate highways.

Defendant oil companies engaged in interstate sales. They sold the liquid asphalt to their subsidiaries who manufacture the asphaltic concrete. The subsidiaries own the manufacturing hot plants in several states. The sales at issue all took place in southern California, meaning that the asphaltic concrete was manufactured, sold, and delivered within California. *Id.* at 189–90, 95 S.Ct. 392.

The Court reasoned:

> In contrast to [the Sherman Act], the distinct "in commerce" language of the Clayton and Robinson–Patman Act provisions with which we are concerned here appears to denote only persons or activities within the flow of interstate commerce—the practical, economic continuity in the generation of goods and services for interstate markets and their transport and distribution to the consumer. If this is so, the jurisdictional requirements of these provisions cannot be satisfied merely by showing that allegedly anticompetitive acquisitions and activities affect commerce.

*Id.* at 195, 95 S.Ct. 392.

Consequently, the Court held that plaintiff's claims must fail unless it appears that the subsidiary's discriminatory sales occur in the course of its interstate activities. *Id.* The use of the product in an interstate highway, an instrumentality of interstate commerce, was not interstate activities on the part of the manufacturer and thus insufficient to confer jurisdiction. The Court held that the intrastate sales of asphaltic concrete to interstate highway contractors are not sales "in commerce" as a matter of law within the jurisdictional ambit of § 2(a). *Id.* at 199, 95 S.Ct. 392.

I recognize that the jurisdictional language in § 2(a) has an additional limitation not found in § 2(c) that the sales at issue must also be in commerce. *Gulf Oil* does not base its analysis on this additional language, however. I conclude that its analysis applies with equal force to § 2(c).

Rotec contends that *Rangen* is still good law. It points to a Ninth Circuit case, citing Gulf Oil for a different point of law, which cites *Rangen's* test concerning the interstate character of the companies. *May Department Store v. Graphic Process Company,* 637 F.2d 1211 (9th Cir.1980). The court was analyzing whether to grant plaintiff a chance to replead its admittedly conclusionary and insufficient federal jurisdictional facts in a § 2(c) case. The court stated:

> The interstate character of the companies involved may provide a sufficient commerce nexus to meet the jurisdictional requirement. [citing *Rangen* ] Since it is not clear that the deficiency cannot be overcome by amendment, we remand with instructions that May be allowed to amend its complaint to attempt to properly allege the interstate commerce requirement of [§ 2(C) ].

*Id.* at 1216. There is no analysis of the effect of *Gulf Oil* on *Rangen*. *Gulf Oil* clearly disavows an "affect on commerce" test. I find that if squarely faced with the issue, the Circuit would agree that *Rangen* is no longer good law.

In summary, "American antitrust laws do not regulate the competitive conditions of other nations' economies." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 582, 106 S.Ct.

1348, 89 L.Ed.2d 538 (1986). Summary judgment is granted against all Robinson–Patman Act claims.

## II. *RICO*

Rotec alleges that Tucker violated the Foreign Corrupt Practices Act ("FCPA") [4], 15 U.S.C. § 78dd–2, by conduct constituting racketeering activity as prohibited by the Racketeering Influenced Corruption Organizations Act ("RICO"), 18 U.S.C. § 1962(c). It alleges that Mitsubishi conspired to violate RICO in violation of § 1962(d).

RICO prohibits the following:

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

18 U.S.C. § 1962(c), (d).

■ A violation under § 1962(c) requires proof of: (1) conduct; (2) of an enterprise; (3) through a pattern; (4) of racketeering activity. *Howard v. America Online, Inc.,* 208 F.3d 741, 746 (9th Cir.), *cert. denied,* 531 U.S. 828, 121 S.Ct. 77, 148 L.Ed.2d 40 (2000).

### A. *Predicate Acts*

Rotec relies on the following predicate acts: (1) Tucker's award of a quality control position to Zhuang Ming Xiang; and (2) Tucker's knowledge of Arvin Yu's pay-

ments to people. It alleges that both acts violate the FCPA.

■ Predicate acts must be conduct which is indictable. *Howard v. America Online, Inc.,* 208 F.3d 741, 748 (9th Cir.), *cert. denied,* 531 U.S. 828, 121 S.Ct. 77, 148 L.Ed.2d 40 (2000); § 1961(1). Defendants agree that a violation of the FCPA is within the scope of RICO predicate acts.

The FCPA states:

It shall be unlawful for any domestic concern, [other than an issuer], [or for an agent of a domestic concern] to make use of the mails or any means or instrumentality of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, or authorization of the payment of any money, or offer, gift, promise to give, or authorization of the giving of anything of value to—

(1) any foreign official for purposes of—

(A) (i) influencing any act or decision of the foreign official in his official capacity, (ii) inducing such foreign official to do or omit to do any act in violation of the unlawful duty of such official, or (iii) securing any improper advantage; or

(B) inducing such foreign official to use his influence with a foreign government or instrumentality thereof to affect or influence any act or decision of such government or instrumentality,

in order to assist such domestic concern in obtaining or retaining business for or with, or directing business to, any person;

15 U.S.C. § 78dd 2(a).

### i. *Quality Control Position*

Defendants contend that Rotec has no evidence to establish that the award of the

---

**4.** Rotec also alleges that Tucker violated the Travel Act with the same predicate acts but agreed at oral argument that an analysis under the Travel Act adds nothing. Thus, I will not consider that statute.

quality control position to Zhuang Ming Xiang violates the FCPA. Defendants note that there is no evidence that Zhuang Ming Xiang was ever paid for the position and no evidence that the position, for Stage I work, was intended to influence contracts awarded for Stage II.

Although I agree that the evidence is thin, I conclude that Rotec has raised a factual issue that the quality control position awarded to Zhuang Ming Xiang violates the FCPA, giving the benefit of all inferences to Rotec. A jury could find that Tucker, the agent of a domestic concern, used a fax, an instrument of interstate commerce, corruptly to further the giving of something of value, the quality control position, to Zhuang Ming Xiang, arguably a foreign official because of the government involvement in China Three Gorges Development, to influence his future decisions and comments as part of the Evaluation Committee. Thus, this will count as one predicate act.

### ii. *Arvin Yu's Payments*

[6] Defendants contend that Rotec has not come forward with evidence to establish that Tucker's knowledge of Arvin Yu's payments "to various people in China" violate the FCPA, in particular: (1) Tucker's specific knowledge or involvement in Yu's alleged payments; (2) who the payments were made to; (3) the purpose of the payments; and (4) when the payments were made.

I agree with defendants that there is insufficient evidence to consider any payments by Arvin Yu to be a violation of the FCPA. Tucker has no knowledge of specific payments. There is no evidence that payments were made to foreign officials. There is no evidence of use of the mails or another instrumentality of interstate commerce to make the payments. His knowledge is based on rumor. Rumor would not support an indictment. Consequently, I

do not consider the possible payments by Arvin Yu to be a predicate act.

### B. *Pattern of Racketeering Activity*

■■ A pattern is at least two acts of racketeering activity within ten years of each other. *Howard v. America Online, Inc.*, 208 F.3d 741, 746 (9th Cir.), *cert. denied*, 531 U.S. 828, 121 S.Ct. 77, 148 L.Ed.2d 40 (2000); 18 U.S.C. § 1961(5). Although two acts are necessary, they are not sufficient to find a violation. A pattern requires a showing of a relationship between the predicates and of the threat of continuing activity. *Id.* at 746.

Here, only one predicate act remains. By definition, it cannot establish a pattern of racketeering activity.

### C. *Enterprise*

■ Defendants contend that Rotec has not come forward with evidence to establish the necessary elements of a RICO enterprise, specifically: (1) whether the enterprise is formal or informal; (2) the decision-making structure; and (3) how each defendant participated in the enterprise.

■ An enterprise under RICO includes groups with a formal legal structure and groups whose members merely associate in fact. *Simon v. Value Behavioral Health, Inc.*, 208 F.3d 1073, 1083 (9th Cir.), *amended on other grounds*, 234 F.3d 428 (2000), *cert. denied*, 531 U.S. 1104, 121 S.Ct. 843, 148 L.Ed.2d 723 (2001). A group cannot be an enterprise, however, unless it exists independently from the racketeering activity in which it engages. It must have some sort of structure for making decisions and mechanisms for controlling and directing the affairs of the group on an on-going basis rather than an ad hoc basis. A conspiracy is not a RICO enterprise. *Id.*

Rotec contends that the enterprise consists of Mitsubishi, the Tucker defendants, CS Johnson, Potain, Arvin Yu, and possibly others, beginning in April 1995 when CS Johnson and Potain agreed to pursue aggressively a contract for concrete placement in Stage II of the Project. There is no evidence, however, of the decision-making structure of the enterprise. At best, we have a list of actions taken by members of the enterprise. It is not clear that the group operated jointly when performing the allegedly illegal actions. I conclude that Rotec has failed to raise a factual issue that a RICO enterprise was involved.

### D. *Summary of § 1962(c) Claim*

Summary judgment is granted against the § 1962(c) RICO claim for failure to establish a pattern of racketeering activity and failure to establish an enterprise.

### E. *RICO Conspiracy Claim*

The RICO conspiracy claim against Mitsubishi relies on the RICO claim against Tucker. "To establish a violation of section 1962(d) [conspiracy], Plaintiffs must allege either an agreement that is a substantive violation of RICO or that the defendants agreed to commit, or participated in, a violation of two predicate offenses." *Howard v. America Online, Inc.*, 208 F.3d 741, 751 (9th Cir.2000). Because the substantive RICO claim against Tucker failed to survive summary judgment, I also grant summary judgment against the conspiracy claim.

### III. *State Tort Claim*

Rotec alleges a claim for tortious interference with prospective economic advantage under both Oregon and Illinois law. It contends that the improper motive or improper means element of the tort is met by defendants' violations of the Robinson–Patman Act, violations of RICO, or common law bribery.

The parties devoted their main efforts to extensive briefing of the federal statutory claims. They also relied on the assumption that if the federal claims failed, the state tort would also fail, and may not have raised all possible arguments against the tort. On the record before me, it is unclear whether to apply Oregon or Illinois law. I will assume Oregon law is applicable without deciding the issue at this point.

The elements of the tort of intentional interference with economic relations are: (1) the existence of a professional or business relationship; (2) intentional interference with the relationship; (3) by a third party; (4) accomplished through improper means or for an improper purpose; (5) a causal effect between the interference and damage to the economic relationship; and (6) damages. *McGanty v. Staudenraus*, 321 Or. 532, 535, 901 P.2d 841 (1995).

I conclude that Rotec has raised a factual issue that it can prove all of these elements. In particular, the improper means could be satisfied by the single predicate act under the RICO analysis, the quality control job offer. Summary judgment is denied against this claim.

### CONCLUSION

Defendant Mitsubishi Corporation's motion to dismiss and/or for summary judgment (# 23) is granted in part. Tucker defendants' motion to dismiss and/or for summary judgment (# 27) is granted in part. The intentional interference with prospective economic advantage claim remains for trial against all defendants.