**ROTEC INDUSTRIES, INC., an Illinois corporation, Plaintiff,**

v.

**MITSUBISHI CORPORATION, a corporation organized under the laws of Japan; Mitsubishi International Corporation, a New York corporation; Tucker Associates, Inc., an Oregon corporation; and Garry Tucker, an individual, Defendants.**

No. 99–2080.

United States District Court,
C.D. Illinois,
Urbana Division.

Jan. 4, 2002.

George P. McAndrews, McAndrews, Held & Malloy, Ltd., Chicago, IL, for Plaintiff.

Michael O. Warnecke, Mayer, Brown & Platt, Chicago, IL, John Bramfeld, Bramfeld & Wong, Champaign, IL, for Defendants.

## ORDER

McCUSKEY, District Judge.

On April 12, 1999, Plaintiff, Rotec Industries, Inc., filed its Complaint (# 1) against Defendants, Mitsubishi Corporation (MC), Mitsubishi International Corporation (MIC), Tucker Associates, Inc. and Garry Tucker (collectively referred to as "Tucker"). This case is now before the court for ruling on Defendants' Motion for Summary Judgment (# 39). Following this court's careful and thorough review of the documents submitted by the parties and the arguments of the parties, Defendants' Motion (# 39) is GRANTED.

## FACTS [1]

This action concerns the Three Gorges Dam Project in China. When completed, the Three Gorges Dam will be the largest

---

1. These facts have been summarized from the Statement of Undisputed Material Facts prepared by Defendants, Plaintiff's Response, and from the documents submitted by the parties. This court notes that facts which Plaintiff has not disputed but, without expla- nation, has declared "immaterial" have been considered admitted by this court. *See Benion v. Bank One, Dayton, N.A.,* 967 F.Supp. 1031, 1032 n. 1 (N.D.Ill.1997), *aff'd,* 144 F.3d 1056 (7th Cir.1998), *cert. denied,* 525 U.S. 963, 119 S.Ct. 406, 142 L.Ed.2d 329 (1998).

hydropower project in the world. It will stretch over a mile wide across the Yangtze River. Construction of the dam began in 1993. It will take 17 years to build and will be completed in three stages. Construction of this enormous project will require placement of approximately 27,000,000 cubic meters of concrete. The China Yangtze Three Gorges Project Development Corporation (CTGPC) is the "owner" of the Three Gorges Dam Project.

Plaintiff, an Illinois company whose principal place of business is in Elmhurst, Illinois, manufactures heavy construction machinery, including concrete placement equipment. Plaintiff's largest product is its Towerbelt, a tower crane supported articulated concrete conveyor belt system. Robert F. Oury, Plaintiff's chief executive· officer, invented the Towerbelt and assigned the patent for the Towerbelt to Plaintiff. This patent expired in March 1998. Oury made many visits to China, including one in September 1993, to discuss using Plaintiff's equipment, including the Towerbelt, in the·construction of the Three Gorges Dam. Leon Umberger, Plaintiff's projects manager at that time, also visited China in September 1993. In China, Umberger worked with Wong Yong Hong, a Chinese engineer, in preparing drawings showing how Plaintiff's equipment could be used in constructing the Three Gorges Dam Project. The Chinese retained possession of these drawings.

In November 1993, Wong Yong Hong, Li Shuensha, another Chinese engineer, and Ms. Huang Wenxia, an interpreter, came to Plaintiff's office in Illinois to work on a feasibility study (Study) regarding the use of Plaintiff's equipment for concrete placement at the Three Gorges Dam Project. Steven Ledger, Plaintiff's president, was the principal person involved in the preparation of the Study on Plaintiff's side. Ledger testified that Wong and Li, the two

Chinese engineers, provided background and scheduling information for the Study. However, Ledger also testified that the Chinese engineers were "involved every step of the way" and worked at Plaintiff's office until the Study was completed in February 1994. The document was entitled Concrete Construction Equipment for Three Gorges Project and was 50 pages long. The Study consisted of five chapters. Chapter 1 contained general information about the Three Gorges Dam Project which was provided by the Chinese. Chapter 2 contained a proposal for concrete placement for Stage I utilizing Plaintiff's equipment. Chapter 3 was a proposal for concrete placement for Stage II, and Chapter 4 was a proposal for concrete placement for Stage III. Chapter 5 consisted of drawings of Plaintiff's equipment. The Contents page at the beginning of the Study was stamped with a confidentiality stamp, which stated, in pertinent part, "Notice: This Drawing Contains Confidential Information and is the Exclusive Property of Rotec Industries." This language was also included on most of the drawings in Chapter 5. The Study was translated from English to Chinese at Plaintiff's office. The Chinese version did not include any confidentiality language except on the Chapter 5 drawings.

In early February 1994, a ten-member Chinese delegation visited Plaintiff's offices in Illinois and also visited the Huites Dam in Mexico which was being built using Plaintiff's equipment. The members of this delegation were all provided with the Chinese version of the Study. CTGPC later prepared a detailed report regarding the delegations' visit to Plaintiff's offices and the Huites Dam in Mexico, as well as other locations. This report included a detailed summary of the Study. The report had no confidential markings or statements in it. MC received a copy of this Inspection Report from CTGPC.

On February 19, 1994, Plaintiff and the CTGPC entered into an Agreement of Intent. This agreement stated that the "proposal prepared by [Plaintiff] for the first stage concrete placement for [the Three Gorges Dam Project] is technically reasonable and feasible. Rotec conveyors can be used as important concrete placement equipment for the first stage." The agreement also stated that "the proposal for the second stage concrete placement could be an important alternative solution and needs further study." The agreement further stated that CTGPC intended to purchase from Plaintiff one Towerbelt and two Creter Cranes. This equipment was for Stage I of the Three Gorges Dam Project. Plaintiff agreed to present a formal quotation to CTGPC within 10 days.

Plaintiff prepared a document called a Pro Forma Quotation which was dated March 1, 1994. This was Plaintiff's formal quotation for providing equipment and services for Stage I of the Three Gorges Dam Project. It was submitted to CTGPC on or about March 1, 1994. This document was not marked or stamped confidential. On April 13, 1994, Masaji Santo of MC and Saturo Noda from MIC met with John Mattson, Plaintiff's assistant sales manager, and Ken Novak, a financial consultant for Plaintiff, at Plaintiff's office. MC is a large Japanese trading company based in Tokyo, Japan, and MIC is a subsidiary of MC with a place of business in Chicago. MC had been involved in the supply of construction equipment in connection with the Three Gorges Dam Project. During the course of the April 13, 1994, meeting, the representatives of MC and Plaintiff discussed the possibility of MC financing the purchase or lease of equipment as well as using MC's contacts in China to assist Plaintiff.

During the meeting at Plaintiff's offices, Masaji Santo showed Mattson a copy of the Pro Forma Quotation. Takashi Hasegawa of MC testified that he received the Pro Forma Quotation from CTGPC because of MC's interest in providing financing for the purchase of Plaintiff's equipment for Stage I of the Three Gorges Dam Project. Hasegawa testified that MC wanted to work together with Plaintiff. He testified that the Pro Forma Quotation was not used by MC in bidding on providing equipment for Stage II. Following the April 13, 1994, meeting, Plaintiff had subsequent discussions with MIC and MC regarding the possibility of a business relationship between Plaintiff and MC.

Plaintiff revised the Pro Forma Quotation several times. On November 15, 1994, Plaintiff and CTGPC entered into a contract to provide equipment for Stage I of the Three Gorges Dam Project. The agreement provided that CTGPC would pay Plaintiff $13,400,000 for the equipment and services, significantly less than the price proposed in the March 1, 1994, Pro Forma Quotation. The equipment actually provided by Plaintiff for Stage I was different from the equipment specified in the Pro Forma Quotation and different from what was proposed in the Study. In addition, the equipment was used and set up differently on the job site.

In August 1995, CTGPC announced that it was soliciting bids for the Stage II concrete placement equipment for the Three Gorges Dam Project. A complete set of bidding documents could be purchased by any interested eligible bidder for $1,000. In addition to requesting bidders to propose equipment for concrete placement and prices for that equipment, the bidding documents also requested that the bidders provide construction schemes for how the equipment would be used. The bidding documents further identified three alternative concrete placement methods for which bidders could submit proposals: (1) huge

tower crane; (2) tower belt; or (3) cable crane. The bidding documents available to the public for purchase included portions of the Study.

In October 1995, MC, Tucker and Potain attended the formal pre-bid conference held by the Three Gorges Dam Project in Yichang, China. Potain is a French company which manufactures cranes. Tucker is a resident of Oregon, and his corporation provides engineering consulting services. In December 1995, Potain and C.S. Johnson entered into an exclusive co-operation agreement and a Supply Agreement whereby they agreed to cooperate during the bidding process on Stage II and, if successful, the execution of a supply contract. C.S. Johnson was an Illinois corporation headquartered in Champaign, Illinois. On January 13, 1996, MC and Potain entered into a Consortium Agreement. This Agreement stated that the parties desired to participate in the Three Gorges Dam Project by collaborating with each other to prepare and submit a proposal and, if the proposal was accepted, to negotiate and enter into a contract with the Chinese. In the Agreement, Potain agreed to pay MC a fee for its assistance. None of these contracts with Potain included an agreement to share profits or losses.

In January 1996, the MC/Potain Consortium submitted a bid· to the Chinese to provide equipment for Stage II of the Three Gorges Dam Project. This bid proposal put forth two alternative schemes for placing the concrete. One system proposed involved Potain cranes, hauling trucks and buckets. This proposed system did not include C.S. Johnson as a supplier and was designed by the Gezhouba Construction Bureau, ·a Chinese contractor. The other system proposed was a tower crane mounted conveyor system whereby Potain was to supply the tower cranes and C.S. Johnson would supply the concrete conveyor equipment. This system was referred to as a Top Belt system. The bid proposed seven of these Top Belt systems. This construction scheme layout was designed by the Eighth Water Conservancy and Hydropower Engineering Bureau of China, another Chinese contractor.

In preparing this proposal, Potain prepared the pricing of the tower cranes and C.S. Johnson prepared the pricing of the conveyors. Tucker was affiliated with C.S. Johnson and was responsible for preparing ·C.S. Johnson's portion of the bid. During discovery, a Chinese–English version of the Study was found· in C.S. Johnson's files. This version of the Study was incomplete because it did not contain Chapter 4. This Chinese–English version also did not include any confidentiality language except on the drawings ·in Chapter 5. In addition, two drawings from Chapter 5 of the·Study were found to be in Tucker's possession. Tucker testified that he did not have a copy of the Study and did ·not use any of Plaintiff's drawings in working on the bid proposal. Yves Guillouty, the main commercial negotiator for Potain who prepared the pricing for the bid proposal, testified that he never saw the Pro Forma Quotation or the Study. He testified that the Pro Forma Quotation would have had no value to him. In addition, Michel Vitteaut, who was the principal technical manager involved in the Stage II bid and contracting process for Potain, testified that he never saw the Pro Forma Quotation or any. version of the Study. The proposed prices set forth in the MC/Potain bid proposal for the Potain Top Belt system were higher than the prices identified in Plaintiff's Pro Forma Quotation for Plaintiff's Towerbelt system.

On January 10, 1996, Plaintiff entered into an agreement with Guỳ F. Atkinson Co. and Mitsui & Co., a New York corporation. This agreement stated that Plain-

tiff intended to submit a bid, with Atkinson and Mitsui as subcontractors. On January 11, 1996, Plaintiff submitted its bid proposal as Rotec/Mitsui. Plaintiff proposed eight Towerbelt Systems and other equipment with a suggested layout and placement of its equipment. Plaintiff's bid proposal included important differences when compared to the proposal for concrete placement for Stage II included in Chapter 3 of the Study.

A bid opening was held in China on January 15, 1996. Besides the bids submitted by MC/Potain and Rotec/Mitsui, other bidders included Kroll Cranes A/S from Denmark, Shanghai Port Machinery Plant of China, Balama Prima of Hong Kong, Jia Jiang Sino–Russian Consortium and CITIC International Co-operative Limited of China. Plaintiff and MC/Potain submitted the highest bids. On November 1, 1996, Plaintiff entered into a contract with China Resources National to sell three Towerbelts, two cranes, and assorted equipment and services for a total contract price of $30,515,319.

On September 16, 1996, C.S. Johnson and MC entered into an agreement. This agreement stated that they expected to enter into a contract for equipment for Stage II work on the Three Gorges Dam Project. The agreement provided that C.S. Johnson would have responsibility for basic design, detail design and fabrication and design of the equipment. This contract did not include an agreement to share profits and losses. On December 16, 1996, MC, Potain and C.S. Johnson entered into a co-operation agreement. The parties agreed to supply equipment and services, but did not agree to share profits and losses. Also on December 16, 1996, MC, as the Seller, entered into a contract with China Resources National, the Buyer, to sell two Top Belt systems, designed and manufactured by Potain and C.S. Johnson.

The contract price, including associated equipment and services, was $17,825,190.

The contracts with Plaintiff and MC for providing equipment for Stage II show that CTGPC decided to use three Towerbelts and two Top Belts, for a total of five, rather than the larger number proposed by both MC/Potain and Plaintiff. CTGPC ultimately purchased only equipment and did not utilize the bidders' respective layouts and construction schemes. The system proposed by Plaintiff in the Study was not adopted by the CTGPC.

Ledger testified that, in the later part of 1996, he saw a drawing made by the Chinese which depicted a MC/Potain Top Belt. He was shown the drawing to illustrate the proper location of the equipment. Ledger received a copy of the drawing and made notes on it. Ledger did not consider this drawing confidential information. Oury testified that if information about one of Plaintiff's competitors was provided to him by the CTGPC, he assumed that the information was not confidential.

After the MC/Potain Consortium entered into a contract to provide two Top Belt systems for Stage II of the Three Gorges Dam Project, Oury sent many letters by fax in which he complained bitterly and at length to Chinese officials and diplomatic officials. In these faxed letters, Oury disparaged Potain's experience and ability to adequately complete the contract. Oury openly encouraged the Chinese to cancel the contract based upon the fact that C.S. Johnson had filed for bankruptcy. However, the Chinese did not cancel the contract. After C.S. Johnson filed for bankruptcy in July 1997, it was replaced by a Japanese conveyor manufacturer prior to the manufacture of the two Top Belt systems.

In the meantime, on February 14, 1997, Plaintiff filed a Complaint against MC, MIC, Potain, C.S. Johnson, and Tucker in

this court in Case No. 97–2024. Plaintiff alleged patent infringement, copyright infringement and state law claims for trade secrets misappropriation, unlawful interference with prospective advantage and civil conspiracy. C.S. Johnson was dropped as a Defendant in the case after it filed for bankruptcy in July 1997. On July 6, 1998, this court granted Potain's Motion to Dismiss based upon lack of personal jurisdiction. On December 14, 1998, this court entered an Order which granted summary judgment in favor of Defendants on Plaintiff's patent infringement claim. *Rotec Indus., Inc. v. Mitsubishi Corp.*, 36 F.Supp.2d 810 (C.D.Ill.1998), *aff'd,* 215 F.3d 1246 (Fed.Cir.2000). Because Plaintiff had agreed that its copyright infringement case should be dismissed, there was no longer any federal claim before this court. Accordingly, this court declined to exercise supplemental jurisdiction over Plaintiff's remaining state law claims. These claims were dismissed without prejudice, allowing Plaintiff to refile the cause in state court.

On April 22, 1999, Plaintiff filed its Complaint (# 1) in this case against MC, MIC, and Tucker based upon diversity jurisdiction. Plaintiff's Complaint alleged that the named Defendants were part of a joint venture with C.S. Johnson and Potain for the purpose of bidding upon the design and construction of the concrete delivery system at the Three Gorges Dam. Plaintiff alleged that members of the joint venture possessed Plaintiff's trade secrets, specifically its Pro Forma Quotation and Study, and used these trade secrets in submitting its bid. In Count I, Plaintiff alleged that Defendants were liable for the misappropriation of trade secrets in violation of the Illinois Trade Secrets Act (765 Ill. Comp. Stat. 1065/1 et seq.). In Count II, Plaintiff alleged that Defendants were liable for unlawful interference with prospective advantage. In Counts III and IV, Plaintiff alleged that Defendants were liable for civil conspiracy based upon the misappropriation of trade secrets and unlawful interference with prospective advantage.

Plaintiff also filed a Complaint against MC and Tucker in the District Court of Oregon. In that case, Plaintiff alleged that Defendants were liable for violations of the Robinson–Patman Act and Foreign Corrupt Practices Act, through conduct prohibited by the Racketeer Influenced and Corrupt Organizations Act (RICO). Plaintiff also asserted state law claims for tortious interference with prospective economic advantage. On September 14, 2001, the District Court entered an Order which granted summary judgment in favor of Defendants on Plaintiff's Robinson–Patman Act claims and RICO claims. *Rotec Indus., Inc. v. Mitsubishi Corp.*, 163 F.Supp.2d 1268, 1278–80 (D.Or.2001). Plaintiff's claim for intentional interference with prospective economic advantage remained pending. *Rotec Indus., Inc.*, 163 F.Supp.2d at 1280.

On September 21, 2000, Defendants filed a Motion and Memorandum for Summary Judgment (# 39) in this case. Defendants also filed numerous exhibits, including portions of deposition transcripts, in support of their Motion (# 40). Defendants argued that they were entitled to summary judgment on all of Plaintiff's claims because: (1) neither the Study nor the Pro Forma Quotation contained trade secrets under Illinois law; (2) there was no evidence that any of the Defendants acquired, possessed or used the Study; (3) the evidence showed that only MC and MIC possessed the Pro Forma Quotation and it was only used for the purpose of meeting with Plaintiff to discuss providing financing in connection with the purchase of equipment for Stage I and not for purposes of submitting a bid on Stage II; (4) Plaintiffs claims for unlawful interference

and civil conspiracy are preempted and barred by the Illinois Trade Secrets Act; and (5) there is no evidence that Defendants were engaged in a joint venture with Potain and C.S. Johnson. Plaintiff has filed a lengthy Response to Defendants' Motion, with its own exhibits (# 48) and Defendants have filed a Reply (# 50) with exhibits (# 51).

## ANALYSIS

### I. SUMMARY JUDGMENT STANDARD

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In ruling on a motion for summary judgment, a district court has one task and one task only: to decide, based upon the evidence of record, whether there is any material dispute of fact that requires a trial. *Waldridge v. American Hoechst Corp.,* 24 F.3d 918, 920 (7th Cir.1994). In making this determination, the court must consider the evidence in the light most favorable to the party opposing summary judgment. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). However, because the purpose of summary judgment is to isolate and dispose of factually unsupported claims, a plaintiff must respond to the defendant's motion with evidence setting forth specific facts showing that there is a genuine issue for trial. *Michael v. St. Joseph County,* 259 F.3d 842, 845 (7th Cir.2001). To successfully oppose a motion for summary judgment, a plaintiff must do more than raise a "metaphysical doubt" as to the material facts, and instead must present definite, competent evidence to rebut the motion. *Michael,* 259 F.3d at 845.

### II. UNLAWFUL INTERFERENCE AND CONSPIRACY

As noted, Defendants argued that they are entitled to summary judgment on Counts II, III, and IV of Plaintiff's Complaint because Plaintiffs claims for unlawful interference and civil conspiracy are preempted and barred by the Illinois Trade Secrets Act. In its Response to the Motion for Summary Judgment, Plaintiff stated, in a footnote, that it "will not pursue its claims for unlawful interference with a prospective advantage and conspiracy claims that are premised on Defendants' misappropriation of trade secrets." Plaintiff further stated that those claims are therefore moot and need not be resolved by the court. Plaintiff then made the rather disingenuous argument that its "posture in this regard in no way estops [Plaintiff] from pursuing tortuious [sic] interference or conspiracy claims premised on acts other that Defendants' misappropriation of [Plaintiff's] trade secrets."

■ This court notes that Defendants have requested summary judgment on these claims. Plaintiff has not opposed summary judgment on these claims.[2] Ac-

---

**2.** This court notes that it agrees with Defendants that Plaintiff is clearly barred from pursuing these claims. It is well established that claims of intentional interference and conspiracy based upon a misappropriation of trade secrets are preempted by the Illinois Trade Secrets Act. *See* 765 Ill. Comp. Stat. 1065/8(a) (West 2000); *Labor Ready, Inc. v. Williams Staffing, LLC,* 149 F.Supp.2d 398, 413 (N.D.Ill.2001); *Leggett & Platt, Inc. v. Hickory Springs Mfg. Co.,* 132 F.Supp.2d 643, 648–49 (N.D.Ill.2001); *Thomas & Betts Corp. v. Panduit Corp.,* 108 F.Supp.2d 968, 974–75 (N.D.Ill.2000).

cordingly, Defendants are entitled to judgment on these claims and Defendants' Motion for Summary Judgment is GRANTED as to Counts II, III, and IV of Plaintiff's Complaint (# 1). Judgment is entered in favor of Defendants on these claims and Plaintiff is, obviously, "estopped" from pursuing them further in this court.

### III. TRADE SECRET INFRINGEMENT

In Count I of its Complaint (# 1), Plaintiff claimed that Defendants are liable for the misappropriation of trade secrets in violation of the Illinois Trade Secrets Act. Under Illinois law, "a trade secret is defined as any information sufficiently secret to derive economic value from not being generally known by persons who can obtain economic value from it, and subject to reasonable efforts to maintain its secrecy." *Leggett & Platt, Inc. v. Hickory Springs Mfg. Co.*, 132 F.Supp.2d 643, 649 (N.D.Ill.2001), *citing* 765 Ill. Comp. Stat. 1065/2(d). In order to establish the misappropriation of a trade secret under the Illinois statute, a plaintiff must demonstrate that its confidential information was "(i) secret (that is, not generally known in the industry), (ii) misappropriated (that is, stolen from it rather than developed independently or obtained from a third source), and (iii) used in the defendants' business." *Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1265–66 (7th Cir.1992); *Labor Ready, Inc. v. Williams Staffing, LLC*, 149 F.Supp.2d 398, 411 (N.D.Ill.2001); *Leggett & Platt, Inc.*, 132 F.Supp.2d at 649. "It is not enough to point to broad areas of technology and assert that something there must have been secret and misappropriated. The plaintiff must show concrete secrets." *Composite Marine Propellers, Inc.*, 962 F.2d at 1266.

Plaintiff's claim of trade secret misappropriation is based upon the fact that MC and MIC were in possession of the Pro Forma Quotation in April 1994 and that C.S. Johnson was found to be in possession of a Chinese English version of the Study. Plaintiff claims that Defendants are liable for the misappropriation of trade secrets based upon these facts because Defendants were involved in a joint venture with Potain and C.S. Johnson and Plaintiff's trade secrets were used by members of the joint venture.

As previously noted, Defendants argue that they are entitled to summary judgment on this claim because there is no evidence of a joint venture, Plaintiff has not established that the Pro Forma Quotation or the Study were trade secrets entitled to protection under Illinois law, there is no evidence that any of the Defendants in this case possessed or used the Study, and there is no evidence that the Pro Forma Quotation was used by MC or MIC for any purpose other than to propose providing Plaintiff with financing in connection with the purchase of equipment for Stage I.

This court notes that Defendants have made very persuasive arguments that the evidence does not show that Defendants were involved in a joint venture with Potain and C.S. Johnson. Defendants have also persuasively argued that Plaintiff has not established that the Pro Forma Quotation and Study were trade secrets under Illinois law. This court specifically notes that Defendants have provided this court with extensive documentation showing that much of the information contained in the Study which Plaintiff claims was trade secret information, including the drawings in Chapter 5, was publicly available. Moreover, Defendants have also shown that the Pro Forma Quotation was given to MC by the Chinese and that portions of the Study

were supplied to MC and others by the Chinese. Therefore, it appears that much of the information Plaintiff claims is trade secret information was not "stolen" but was rather supplied by a third source, the Chinese. Oury himself testified that if the Chinese gave him information from competitors, he assumed the information was not confidential. However, this court does not need to reach any of these issues because it agrees with Defendants that Plaintiff has presented absolutely no evidence to establish the third essential element of trade secret misappropriation, that Defendants used the alleged trade secrets. This court agrees with Defendants that Plaintiff has presented no evidence that Defendants or the other alleged members of the joint venture, Potain and C.S. Johnson, used either the Study or the Pro Forma Quotation in preparing the bid proposal for Stage II equipment.

Defendants have submitted the deposition testimony of Guillouty, Vitteaut and Tucker that they did not have or use the Pro Forma Quotation or the Study in preparing the MC/Potain bid proposal. In addition, Hasegawa testified that MC used the Pro Forma Quotation only in the attempt to provide financing for the purchase of Plaintiff's equipment, and not in connection with the Stage II bid. In response, Plaintiff has argued that there is strong circumstantial evidence that the Study and the Pro Forma Quotation were used by Defendants or members of the alleged joint venture. Plaintiff notes that Tucker was closely affiliated with C.S. Johnson, which possessed a copy of a Chinese English version of the Study, and also had copies of drawings from the Study in his files. Plaintiff argues that this is "overwhelming circumstantial evidence

that Tucker not only saw, but used [Plaintiff's] Study." Plaintiff argues that the circumstantial evidence shows that Tucker and C.S. Johnson used the Study to design its copy of Plaintiff's Towerbelt and to compete with Plaintiff for the sale of concrete conveyor tower crane systems for the Three Gorges Dam Project. Plaintiff further argues that Defendants misappropriated Plaintiff's Study even if they only used it to avoid Plaintiff's pitfalls, citing *Nilssen v. Motorola, Inc.*, 963 F.Supp. 664, 683 (N.D.Ill.1997). Plaintiff also notes that MC possessed a copy of the Pro Forma Quotation and a copy of the Chinese Inspection Report which stated that a copy of the Study was attached.[3] Plaintiff contends that this provides more circumstantial evidence that the Pro Forma Quotation and the Study were used by Defendants to prepare their bid on Stage II equipment. Plaintiff contends that Defendants' possession of this information gave them a competitive advantage because they knew generally what Plaintiff was proposing and the price at which it was selling its equipment.

It is clear that Plaintiff simply does not believe that the MC/Potain Consortium could have prepared its bid for Stage II equipment without using information from Plaintiff's Study and the Pro Forma Quotation. However, Plaintiff has not provided this court with any evidence to substantiate this strong belief. Plaintiff has not pointed to anything in the MC/Potain bid proposal which is the same as, or even similar to, anything in the Pro Forma Quotation or the Study. Plaintiff also fails to specify any "pitfalls" that Defendants avoided by using the Pro Forma Quotation or the Study. *Cf. Nilssen*, 963 F.Supp. at 683 (the plaintiff avoided summary judgment based, in part, on a report which

**3.** This court notes that Defendants have presented evidence to this court that MC did not, in fact, receive a copy of the Study.

detailed which portions of the plaintiff's design were believed to be incorporated into the defendant's design). This court specifically notes that the construction schemes included in the MC/Potain bid proposal were prepared by Chinese consultants, not any member of the alleged joint venture. Plaintiff has not presented any evidence which shows that any Defendant, or any other member of the alleged joint venture, used anything from the Pro Forma Quotation or the Study in preparing the MC/Potain bid proposal. In short, this court must agree with Defendants that there is no evidence that Plaintiff's alleged trade secrets were used by any of the Defendants.

Plaintiff argues there is enough circumstantial evidence to create a genuine issue of material fact. Plaintiff relies on *PepsiCo, Inc. v. Redmond,* 1995 U.S. Lexis 19437 (N.D.Ill.1995), *aff'd,* 54 F.3d 1262 (7th Cir.1995), and argues that there rarely is convincing direct evidence of misappropriation and misuse, so it can be proved by circumstantial evidence from which inferences may be drawn. In *PepsiCo,* a high-level manager for certain PepsiCo products had access to sensitive information about PepsiCo's costs, pricing and marketing strategies. The manager resigned and accepted a position with a competitor of PepsiCo in a position that would make him directly responsible for managing products that competed directly with the PepsiCo products he had managed. *PepsiCo,* 54 F.3d at 1264–66. The district court found that the manager would inevitably use PepsiCo's trade secrets in his new position. That finding was based upon both the nature of the new position and the manager's lack of candor. *See PepsiCo,* 54 F.3d at 1270–71. The district court therefore imposed a preliminary injunction which prohibited the new employment, and the Seventh Circuit affirmed. *PepsiCo,* 54 F.3d at 1271. The Seventh

Circuit stated that, in those circumstances, unless the manager "possesse[d] an uncanny ability to compartmentalize information, he would necessarily be making decisions ... by relying on his knowledge of [his former employer's] trade secrets." *PepsiCo,* 54 F.3d at 1269.

In *PepsiCo,* it was essentially undisputed that the manager was in possession of important trade secrets that would be directly relevant to his new employment position. In this case, there is no such compelling circumstantial evidence. Instead, Plaintiff essentially claims that the evidence shows that some of the Defendants had access to Plaintiff's claimed trade secrets and that this information would have been valuable to them. Plaintiff claims that this is sufficient circumstantial evidence to raise a genuine issue of material fact regarding whether Defendants misappropriated Plaintiff's trade secrets. This court cannot agree. This court concludes that Plaintiff's argument that Defendants used its alleged trade secrets is based, not on circumstantial evidence, but solely on unsupported speculation.

In this case, Defendants have provided this court with specific evidence, including documents and deposition testimony, which showed that Defendants did not use the Study or the Pro Forma Quotation in preparing the MC/Potain bid proposal. This court therefore concludes that Defendants have established the absence of a genuine issue of material fact as to the use requirement, which Plaintiff must establish to succeed at trial. *See Leggett & Platt, Inc.,* 132 F.Supp.2d at 653. In response, Plaintiff has not presented this court with contradictory evidence to properly rebut the evidence presented by Defendants but instead has argued that Defendants had access to the trade secret information and speculates that Defendants must have used it. This tactic is insufficient to defeat

summary judgment. *See Leggett & Platt, Inc.,* 132 F.Supp.2d at 653. This court concludes that a rational jury could not return a verdict in favor of Plaintiff with respect to its trade secret claim on the basis of the undisputed evidence submitted by Defendants. *See Leggett & Platt, Inc.,* 132 F.Supp.2d at 653. Accordingly, Defendants are entitled to summary judgment on Plaintiff's trade secret misappropriation claim.

IT IS THEREFORE ORDERED:

(1) Defendants' Motion for Summary Judgment (# 39) is GRANTED. Judgment is entered in favor of Defendants and against Plaintiff.

(2) Defendants' Motion in Limine (# 41) is therefore MOOT.

(3) This case is terminated.